THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD JAMES ROE, Defendant-Appellant.

Fourth District   No. 4—91—0463

Opinion filed April 30, 1992.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 1991, a jury convicted defendant, Edward James Roe, of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12–14(a)(1)) and home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12–11(a)(1)). In June 1991, the trial court sentenced him to concurrent

sentences of 24 years in prison for aggravated criminal sexual assault and 10 years in prison for home invasion. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court improperly permitted the State to introduce evidence of defendant's other crimes, and (3) the prosecutor's closing argument deprived defendant of a fair trial.

We affirm.

## I. FACTS

At 6 p.m. on Monday, August 27, 1990, the victim, L.M., a 24-year-old woman, went to the trailer of Bill Evans, her boyfriend. She left the trailer only once that night, walking to a store to get some Cokes. The route she walked took her past the Shady Rest Motel.

Sometime between 11 and 11:30 p.m., Evans left the trailer to go to work. L.M. locked the doors after he left. Because the weather was extremely hot and the trailer had no air conditioning, she left the trailer's windows open. L.M. lay down to watch T.V. and fell asleep. Around 3 in the morning, she awakened and saw a man standing across the room. The man was wearing one of Evans' black T-shirts over his head. The man had cut holes in the shirt for his eyes and mouth so that L.M. could not see his face or hair. He wore another black T-shirt that came down to his waist, and had sleeves almost to the elbow. He was naked from the waist down. In his hand he held a pocketknife with its blade extended. L.M. described the knife as "a small lock blade with brass on both ends ***[;] it had three brass dots on it."

L.M. screamed and the man quickly came over to her. She then grabbed both of his hands and cut her finger on the pocketknife. He told her to take her clothes off, and she complied. She was afraid and asked him not to kill her. After L.M. undressed, the man fondled her breasts and then had sexual intercourse with her, during which he kept the knife at her throat. L.M. described the man as reeking of alcohol.

After the man ejaculated, he got up and walked over to the coffee table on which L.M.'s cigarettes were located and asked if he could have one. L.M. said yes and asked if she could have one, too. The man picked up L.M.'s pack of cigarettes, took one for himself, and gave one to L.M. He was not wearing gloves at the time. L.M. had bought the pack of cigarettes Friday or Saturday at the Shop 'N Save grocery store where she then worked, and she was raped Monday night after midnight. Since she purchased the cigarettes, she had kept the cigarette pack in her purse prior to the evening in question. She

testified that only she, Evans, and the rapist touched the cigarette pack.

As L.M. was seated on the couch on which the man had raped her, she observed him get the cigarettes and estimated him to be approximately 5 feet 9 inches tall, 160 pounds, with brown eyes. She did not notice any scars or tattoos but did notice that he had little or no pubic hair. She explained that because the lighting in the trailer was dim, she could not be sure about whether he had no pubic hair or whether it was simply cut short. Similarly, she could not see the rapist's eyes particularly well, nor could she tell the rapist's hair color. The rapist left without removing the T-shirt he wore on his head, and at trial L.M. was unable to identify defendant as the man who raped her.

L.M. called the police after the rapist left. When they arrived at the trailer, she pointed out the pack of cigarettes that the rapist had handled. A fingerprint expert later testified that one of the fingerprints on the package belonged to defendant. Of the three latent fingerprints on the pack's cellophane wrapper suitable for comparison, the expert testified that two belonged to L.M. and one belonged to defendant.

A few days after this incident, when L.M. was back at work at Shop 'N Save, Gary Heckwine walked into the store and said "Well, isn't it a good fuck." L.M. thought Heckwine might be the man who raped her because of this comment, the sound of his voice, and his similarity in height and weight to that of the rapist. Because she never saw the face of the man who raped her, Heckwine's facial features had nothing to do with her belief that he was the rapist. Heckwine's fingerprints were not found on the cigarette pack.

Shirley Creighton, who lived in the same neighborhood as Evans, testified that about 4 a.m. on September 16, 1990 (two weeks after L.M.'s rape), she was in bed with her 2½-year-old daughter when she heard a loud noise. She looked down on the floor and saw a man lying there. She could not see his face because it was covered by the afghan that had been on her bed. She went to the front room where her husband was sleeping, awakened him, and told him someone was lying on the floor of their bedroom. Her husband then went to their bedroom, and she heard the men wrestling and furniture breaking. Because they did not have a phone, she fled the house in order to call the police. She never saw the man's face. Later that day, she discovered that the screen in her back door was cut.

Larry Creighton testified that around 5 a.m. on September 16, 1990, he was asleep on his living room couch when his wife awakened

him and said, "Somebody is in our bedroom." When Creighton went in the bedroom, he saw defendant, who was not masked, standing in the corner. Creighton had never before seen defendant. Creighton struggled with defendant and then threw him out the door of his residence. As they struggled, defendant yelled, "Where the hell am I?" Creighton detected a strong odor of whiskey about defendant.

Creighton "guessed" the defendant to be approximately 5 feet 9 inches tall and to weigh 150 pounds. Creighton described himself at around 5 feet 7½ inches tall and weighing 165 pounds. At a police lineup on October 26, 1990, Creighton positively identified defendant as the man Creighton discovered in his residence.

The morning after this incident, Shirley Creighton found her daughter in the bedroom holding a knife that had its blade extended. She contacted the police about the knife, and L.M. ultimately identified it at trial as the one used by the man who raped her. Larry Creighton also testified that his child found a pocketknife on the bedroom floor of his residence after the incident. Creighton said the knife was not in his home before defendant entered.

Deputy Sandra Hinsey of the Sangamon County sheriff's department, the lead investigator in this case, testified that her investigation was at a standstill until she learned of the incident at the Creighton residence. Hinsey thought that the same individual might be involved in both incidents because (1) the Creighton residence was only a few blocks from the Evans'trailer, (2) the man involved generally fit the description given by L.M., (3) the similar time of the incident, and (4) the presence of the knife at both incidents.

Deputy Robert Vose of the Sangamon County sheriff's department testified that he served an arrest warrant on defendant on October 16, 1990. Later that day, Vose saw defendant with his pants partially down and testified that defendant's pubic hair was rather short and appeared to be trimmed.

Defendant presented evidence that in November 1990, he was 5 feet 4½ inches tall, weighed 133 pounds and had blue eyes. None of the hair samples taken from defendant matched the head hair collected from the clothing that L.M. identified as being worn by the rapist.

Defendant also presented an alibi witness, who testified that she was with defendant in a room at the Shady Rest Motel during the morning on which L.M. was raped. Defendant's room at the motel had a window that faced the highway along which L.M. had walked on the night of the rape.

On the above evidence, the jury convicted defendant of both aggravated criminal sexual assault and home invasion.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was not sufficient to prove him guilty beyond a reasonable doubt. In support of this claim, defendant argues the following: (1) L.M.'s description of the rapist's height, weight, and eye color differs from defendant's height, weight, and eye color; (2) defendant has tattoos on his fingers and upper arms, and L.M. failed to notice any such tattoos on the rapist; (3) a few weeks after she was raped, L.M. described Heckwine as a person who she thought might be the rapist; (4) semen and hair samples obtained from L.M. could not be identified as coming from defendant; (5) L.M. thought the rapist's pubic hair had either been shaved or cut short, yet a forensic scientist determined that the sample of defendant's pubic hair that was obtained two months after L.M.'s rape did not show that defendant's pubic hair had ever been cut or cropped; and (6) defendant presented an alibi witness who testified that defendant was with her during the time that L.M. was raped.

In response to this argument, the State cites the following: (1) the discrepancy between L.M.'s description of the rapist's height and weight and the height and weight of defendant resulted from her being seated on the sofa when defendant was standing; (2) L.M.'s observation that the rapist had little or no pubic hair matched the testimony of the deputy sheriff who observed defendant seven weeks after the incident and noticed that defendant's pubic hair appeared to be trimmed and was rather short; (3) L.M. positively identified the pocketknife that defendant left at the Creighton residence (following his break-in there) as the knife the rapist used to threaten her during the rape, specifically noting the "three little brass buttons" on the knife handle in making her identification; (4) defendant's fingerprint on the cigarette pack recovered from the scene of L.M.'s rape, along with two fingerprints of L.M., and the fact that only L.M., her boyfriend, and the rapist ever touched that cigarette pack; and (5) hours before she was raped, L.M. had walked past the motel in which defendant was staying on her way to buy some Cokes, and defendant may have seen her and followed her to Evans' trailer.

■ Defendant's challenge on appeal to the sufficiency of the evidence to convict him must fail if *any* rational trier of fact, when viewing the evidence in the light most favorable to the prosecution, could conclude that the State had proved the essential elements of the crime beyond a reasonable doubt. (See *People v. Young* (1989), 128 Ill.

2d 1, 49, 538 N.E.2d 461, 472-73.) When we consider the evidence in the present case in accordance with this standard, we conclude that it is sufficient to prove the defendant guilty of both aggravated criminal sexual assault and home invasion.

## III. Evidence Of Other Crimes

Defendant next argues that the trial court erred in permitting the State to present evidence of defendant's break-in at the Creighton residence and the discovery therein of the pocketknife used in the rape of L.M.

In the present case, L.M. could not identify the man who raped her because his face was covered at all times. Accordingly, evidence circumstantially identifying defendant as the rapist, such as the link between defendant and the pocketknife used by the rapist, had strong probative value. Therefore, because L.M. positively identified the pocketknife recovered from the Creighton residence as the knife used by the rapist, the State was entitled to demonstrate the link between defendant and the knife, and the trial court's ruling admitting that evidence was correct. See *People v. Phillips* (1989), 127 Ill. 2d 499, 520, 538 N.E.2d 500, 508.

We also hold that because defendant's connection to that knife cannot be innocently explained, the State was entitled to elicit fully defendant's criminal behavior at the Creighton residence. On these facts, any truncated explanation of the events at that residence—given to the jury in an effort to reduce prejudice to defendant—might weaken the link between defendant and the knife and confuse the jury.

Our conclusion that the State was justified in bringing forth all of the circumstances surrounding defendant's break-in at the Creighton residence may best be explained by considering the following hypothetical in which the State would be hard pressed to justify presenting evidence of a defendant's criminality when the State seeks to link the defendant to a particular weapon. If the State wished to demonstrate the link between a defendant and a particular gun, testimony that positively identified the gun in question to be in defendant's possession on a given date, time, and place would suffice to establish the desired linkage. In this hypothetical, it seems hardly necessary for the State to establish linkage by showing further that the witness who identified the gun in defendant's possession happened to see it at that time because defendant was pointing it at her during an armed robbery. While the evidence of the defendant's commission of the armed robbery *might be admissible* (depending upon other factors involved in

the witness' identification of the gun and other circumstances of the particular case on trial), we see no reason why (in this hypothetical) the fact that the defendant committed an armed robbery at the time the witness saw the gun in defendant's possession *must always be admissible* in order to show the link between the defendant and the gun.

In the present case, had Larry Creighton testified that he saw defendant in the Creighton residence on September 16, 1990, and that defendant then possessed the pocketknife L.M. later positively identified at trial, the State would be hard pressed to justify admission of evidence regarding the other events at the Creighton residence if that admission were premised *solely* on the need to link the knife to defendant. However, because the knife was found at the Creighton residence the morning after the break-in, the only way the State could explain the link between defendant and the knife was to provide the jury with the details about the break-in.

During the testimony of Larry Creighton, when the State first offered evidence about defendant's break-in at the Creighton residence, the trial court orally instructed the jury (in accordance with Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (hereinafter IPI Criminal 2d)) that the evidence the jury was about to hear concerned defendant's involvement in another offense and was being received solely on the issue of defendant's identification. The trial court further instructed the jury that it should consider this evidence only for this limited purpose.

Defendant had previously filed a motion *in limine* seeking to bar the State from presenting the evidence of his break-in at the Creighton residence. The trial court denied that motion and indicated to defense counsel that it would orally instruct the jury in accordance with IPI Criminal 2d No. 3.14 if counsel would so request. Defense counsel later requested the oral instruction that the court ultimately gave to the jury.

We agree with the trial court's handling of the evidence in this fashion. The trial court's giving IPI Criminal 2d No. 3.14 orally to the jury just before it was to hear the evidence in question likely achieved two goals: (1) the instruction assisted the jury to understand why it was being permitted to hear evidence of defendant's other criminal behavior, and (2) the instruction reduced the likelihood that this evidence of other crimes would prejudice defendant in the jury's eyes by simply showing his propensity to commit crime.

In so concluding, we considered the following committee note to IPI Criminal No. 3.14 in the soon-to-be-published third edition of IPI, which reads as follows:

"At the time the evidence which is the subject of this instruction is first presented to the jury, the Committee recommends that an oral instruction should be given to explain to the jury the limited purpose of this evidence, unless the defendant objects to that instruction." (Illinois Pattern Jury Instructions, Criminal, No. 3.14, Committee Note, at 85 (3d ed. 1992) (hereinafter IPI Criminal 3d).)

We agree with the above committee note and commend the trial court in the present case for correctly handling the other-crimes evidence.

Citing *People v. Johnson* (1986), 114 Ill. 2d 170, 193, 499 N.E.2d 1355, 1365, the State also argues that evidence of defendant's break-in at the Creighton residence was admissible to show "[t]he consequential steps in the investigation" of L.M.'s rape in order to fully explain the State's case to the jury. The State argues that "an explanation of why defendant's fingerprints were matched to the latent fingerprint on the cigarette wrapper, and why the knife was shown to the victim was important to the jury for an understanding of the case." Because we have already held that evidence of defendant's break-in at the Creighton residence was fully admissible for the purpose of showing his identification as L.M.'s rapist, we need not address this additional argument. We mention it nonetheless to point out that the State failed at trial to enunciate this particular ground as a basis for the admissibility of this evidence. As a result, the trial court informed the jury that the evidence of defendant's involvement in an offense other than that charged in the case before it was being received *solely* on the issue of defendant's identification. Again, we note approvingly the following statement from the committee note to IPI Criminal 3d No. 3.14: "Care must be taken to state the proper limited purpose for the evidence. See *People v. King*, 165 Ill. App. 3d 464, 518 N.E.2d 1309, 116 Ill.Dec. 329 (2d Dist.1988)." IPI Criminal 3d No. 3.14, Committee Note, at 85.

IV. THE PROSECUTOR'S CLOSING ARGUMENT

Defendant last argues that the prosecutor's closing argument constituted plain error when (1) he discussed at length the definition of reasonable doubt, and (2) he misstated the law regarding fingerprint evidence.

Regarding defendant's first argument, the prosecutor stated the following during his closing argument:

"Well, ladies and gentlemen, the standards that you are here today on is not a standard of beyond all doubt. It's not a standard of beyond any doubt. It's not a standard of beyond a shadow of a doubt, not 100 percent proof positive, but it's a standard of beyond a reasonable doubt. *You have to have reasonable doubt, and you will always have doubts in this trial when you find him guilty or not guilty.* You will always have doubts about whether you are making the right decision. You will have to accept that *** you will always have some doubts." (Emphasis added.)

Defendant cites the emphasized language in the above quote and argues that the prosecutor first defined reasonable doubt and then twisted its meaning, thereby committing plain error. In *People v. Evans* (1990), 199 Ill. App. 3d 330, 339, 556 N.E.2d 904, 909, this court emphasized that "[n]either the court nor counsel should attempt to define the reasonable doubt standard for the jury." The prosecutor's remarks here constituted such an improper attempt, and had defendant objected to those remarks, the trial court should have (and no doubt would have) sustained the objection. Defendant's failure to object deprived the court of the opportunity to take that corrective action.

Defendant must argue the plain error nature of these remarks because he concedes that he failed to object to them at trial. Citing *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83, 296 N.E.2d 856, 858, defendant argues that this court should not apply the waiver rule to his claims regarding the prosecutor's argument because its impropriety deprived defendant of a fair and impartial trial.

■ We are not persuaded by defendant's argument. We find the remarks here similar to those of the prosecutor in *People v. Ellis* (1985), 134 Ill. App. 3d 924, 926, 481 N.E.2d 320, 322, as follows:

" 'We have the burden of proving the defendant guilty beyond a reasonable doubt. This does not mean beyond the possibility of a doubt or a shadow of a doubt. There is a possibility of some.' "

In *Ellis*, this court wrote that, "[w]hile such comments as these should be avoided, our examination reveals that the comments were not prejudicial." (*Ellis*, 134 Ill. App. 3d at 926, 481 N.E.2d at 322.) The same observations apply to the present case.

Because we find the prosecutor's remarks fall far short of depriving defendant of a fair and impartial trial, we decline his invitation to view those remarks as constituting plain error. See *People v. Collins* (1985), 106 Ill. 2d 237, 276, 478 N.E.2d 267, 284 (even improper com-

ments do not constitute reversible error unless they result in substantial prejudice).

Defendant also complains of the following argument the prosecutor made regarding the fingerprint evidence:

> "[The fingerprint expert] tells you that the man who made these fingerprints on this card, [defendant], was the same man who made the fingerprints on the Marlboro cigarettes, one and the same. He says no two fingerprints are the same. Every one of us has a unique print. He testified that that person, the same person made both prints. *It's conclusive, 100 percent actual proof, that the man, [defendant], was in the residence of William Evans and raped [L.M.]*." (Emphasis added.)

During the prosecutor's rebuttal argument, he again referred to the fingerprint evidence as "100 percent absolute proof."

Defendant argues that under Illinois law, fingerprint evidence is not "100 percent absolute proof" of the defendant's guilt and that the prosecutor misstated the law by so arguing. Defendant explains this argument as follows:

> "[I]t is improper to maintain that circumstantial evidence, amounting only to a fingerprint at the scene, is '100 percent absolute proof' of guilt. Although the State argued that the fingerprint made it '100 percent' sure the defendant was the assailant, other explanations for the presence of the fingerprint existed. There were suggestions in the record that the defendant might have touched the wrapper at a bar or that the prints were transferred from another surface onto the wrapper after the wrapper entered police custody. Therefore the prosecutor's comments on the fingerprint evidence were error."

We reject this argument.

■ Prosecutors are afforded wide latitude in closing argument (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38, 57), and courts should hesitate to interfere with or second-guess those arguments when, as here, they constitute nothing more than hortatory language concerning how the jury should regard the evidence before it. The law restricts closing arguments to discussions of the evidence presented and to reasonable inferences to be drawn therefrom. (*Thompkins*, 121 Ill. 2d at 445, 521 N.E.2d at 57; see also IPI Criminal 2d No. 1.03.) We find nothing improper in the hyperbole the prosecutor used in his closing argument to describe the fingerprint evidence in the present case, and we hold the prosecutor's argument here was consistent with the *Thompkins* and IPI standard.

We especially reject the notion that "suggestions in the record" that purportedly explained how defendant's fingerprint got on the cigarette wrapper somehow render the prosecutor's argument improper. Totally aside from the absence in this record of any such evidence, had it in fact been presented, it would simply have been a factor for the jury to consider and assign whatever weight it saw fit. The presence of such evidence would not impose any limitation upon the prosecutor's exhortations in his closing argument, urging the jury to reject such purported explanations for the presence of defendant's fingerprint on the cigarette wrapper and instead to regard that fingerprint as "100 percent proof" of defendant's guilt.

## V. CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court.

Affirmed.

GREEN, P.J., and McCULLOUGH, J., concur.