THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER HARRIS, Defendant-Appellant.

First District (1st Division)   No. 1—95—0104

Opinion filed May 19, 1997.

598

Larry G. Axelrood and Catharine D. O'Daniel, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Noreen M. Daly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, and kidnapping. Defendant raises the following three issues on appeal: (1) whether the trial court erred in allowing evidence of other crimes allegedly committed by defendant; (2) whether defendant was deprived of effective assistance of counsel; and (3) whether the State made improper comments during closing arguments.

Defendant was indicted for the kidnapping and aggravated criminal sexual assault of D.W. At trial, D.W. testified that on June 11, 1993, at approximately 9:30 p.m., she was walking south on Michigan Avenue in Chicago, on her way to a local sandwich shop. As she approached the northwest corner of 113th and Michigan, she noticed a distinctive black Chevrolet Blazer, with a pink stripe on the side, pull up in front of her. The driver slid into the passenger seat, opened the door, grabbed D.W. by the shirt, and pulled her into the vehicle. As he was pulling her into the Blazer, the driver said, "you must be doing something wrong. You are under arrest for soliciting." D.W. identified defendant as the driver.

D.W. testified that defendant showed her a five-point badge and identified himself as a police officer. He handcuffed D.W. behind her back and told her to sit on the floor in front of the passenger seat. D.W. complied. Defendant then threw a coat over D.W.'s head, but D.W. could still see defendant's face. Defendant drove for between 20 and 45 minutes, during which time he told D.W. in graphic terms that he wanted to have sexual intercourse with her.

When the vehicle stopped, defendant said he was going to look for his partner and exited the truck. The coat was no longer over D.W.'s head, and she was able to see that defendant was wearing police uniform pants, black patent leather shoes and belt, and a black jacket. She also noticed that the radio was missing from the truck and wires were hanging out of the dashboard.

When defendant returned, he said he was unable to locate his partner. He drove for approximately another hour and finally pulled into a wooded area. Defendant exited the vehicle and walked around to the passenger side. He opened the passenger side door and told D.W. to sit sideways on the passenger seat with her legs dangling out the door. Defendant unzipped his pants and told D.W. to take off her clothes. Defendant took the handcuffs off one hand and removed D.W.'s clothes. He then left D.W. naked in the truck while he folded her clothes and left them nearby in the woods. When he returned, defendant had forcible intercourse with D.W. for about 15 minutes. Defendant then attempted to have anal intercourse with D.W., but he was unsuccessful.

Defendant dressed himself and handcuffed D.W. He then carried her into the woods and put her down next to her clothes. Defendant told D.W. to stay there until she could no longer see the lights on the Blazer. D.W. followed defendant's instructions. When the truck was out of sight, D.W. picked up her clothes and walked to the nearest house. She was still naked and unable to dress because she was handcuffed behind her back. She pounded on the door of the house, but no one answered. She went to the next house, and a woman answered the door. The woman wrapped a sheet around D.W. and called the police. The police arrived shortly and took D.W. to St. Francis Hospital in Blue Island. D.W. decided, however, that she just wanted to go home, so she left the hospital and went to her own doctor the next day.

On July 16, 1993, two Chicago police officers asked D.W. to review a book of mug shots. D.W. looked at the book and identified defendant as the man who raped her. Later that evening, D.W. viewed a lineup at the police station and again identified defendant. She also went to the garage and identified defendant's truck as the one in which she was raped.

On cross-examination, D.W. stated that only defendant was dressed in clothes similar to those of a police officer.

The State's next witness was D.H. She testified that defendant raped her on June 3, 1993. D.H. testified that she was walking south on King Drive when a man she identified in court as defendant pulled in front of her in a black Chevrolet Blazer with a pink stripe on the side. Defendant left the truck running, exited the vehicle, and approached D.H. Defendant showed D.H. a badge, told her she was under arrest, and attempted to handcuff her. D.H. resisted, but defendant forced her arms behind her back and put the handcuffs on. Defendant then threw D.H. into the front passenger side of the Blazer.

D.H. testified that defendant forced her onto the floor in front of the passenger seat and put a coat over her head. She said she could still see that he was wearing a black jacket, black shoes, blue pants, and a black baseball cap. Defendant drove for an hour or two, during which time D.H. observed that the radio was missing and wires were hanging out of the dashboard.

Defendant drove to a wooded area. He exited the vehicle, walked around to the passenger side, opened the door, and told D.H. to sit sideways on the passenger seat with her legs dangling out the door. Defendant undressed D.H. from the waist down and had forcible sexual and anal intercourse with her.

Defendant threw D.H.'s clothes into the woods and walked D.H. over to them. Defendant told D.H., naked from the waist down and handcuffed behind her back, not to move until she could no longer see the truck. D.H. waited, picked up her clothes, and went to the same house for help that D.W. went to eight days later. The same woman answered the door and called the police. The police arrived shortly and took D.H. to St. Francis Hospital, where a Vitullo rape kit was prepared.

On June 16, 1993, D.H. also went to the police station and identified defendant as the man who had raped her. She also identified the Blazer in the garage.

Next, the State called Lieutenant Harold Kohn from the Robbins police department. Kohn testified that, at about 12:25 a.m. on June 12, 1993, he responded to a call at a house at 143rd and Kedzie in Robbins, Illinois. When he reached the house, he observed D.W. sitting naked on the porch with her hands cuffed behind her back. He noticed that the keyholes of the handcuffs were turned out, which is a procedure commonly employed by law enforcement officers. He also spoke with the owner of the house, whom he had met one week earlier after D.H. was assaulted.

Kohn testified that he followed D.W. to the hospital and attempted to interview her. She was very upset and did not want to stay at the hospital, but she offered Kohn descriptions of her attacker and the Blazer. She said the attacker was a light-skinned black male, 5 feet 9 inches to 6 feet 2 inches in height, weighing 220 to 230 pounds, and wearing police uniform pants, patent leather shoes, a white uniform shirt, and a dark blue uniform jacket.

Kohn was also present at the lineup on June 16, 1993. He testified that defendant was number four in the lineup and that D.W. identified him without hesitation. Kohn also accompanied D.W. into the garage, where she identified defendant's Blazer.

Sergeant Leo Rojek of the Chicago police department testified that on June 16, 1993, he showed D.W. a mug shot book, and D.W. identified defendant as her attacker. Rojek was also investigating the D.H. assault. He had shown D.H. the same book on June 9, but defendant's photograph was not in the book at that time, and D.H. was unable to identify anyone.

Upon D.W.'s identification, Rojek arrested defendant and read him his *Miranda* rights. At the time of the arrest, defendant was wearing a white uniform shirt, patent leather shoes and belt, and dark blue "police type" pants. Defendant's Blazer was located and taken to the police station.

Stipulations were entered into evidence describing how the Vitullo kit and blood tests were administered and establishing a sufficient chain of custody for the samples.

The State's final witness was Kevin Lumey, a forensic biologist with the Illinois State Police Laboratory. The trial court found Lumey to be an expert in the field of DNA analysis and comparison, a procedure that he described in detail. Lumey testified that he conducted DNA tests on the semen taken from D.H. on the night she was assaulted and that it was consistent with defendant's DNA profile. He testified that only 1 in 10 million black men had a DNA profile consistent with defendant's.

The State rested, and defendant's motion for a directed verdict was denied.

The defense called four alibi witnesses. Nader Salam testified that he works at Racine Food and Liquors with defendant. Salam was working the night of June 11, 1993, the night of the assault on D.W., and noticed defendant arrive between 8 and 8:30 p.m. Neither Salam nor defendant left the store until approximately 2:10 a.m. the following morning when defendant's shift ended.

Next, Carlton Short testified that he was the vice-president and commander at Federal Security, defendant's employer. On June 3,

1993, the night of the assault on D.H., Short had a party at his home to celebrate his recent promotion. Short testified that defendant arrived at the party at about 7 p.m. and did not leave until after 1 a.m. the following morning. On cross-examination, Short admitted that he had spoken to defendant four or five times since defendant was arrested, but he testified that none of those conversations pertained to the trial.

Short's wife, Levetta Short, was the next witness. She corroborated her husband's testimony that defendant arrived at their house at 7 p.m. on June 3, 1993, and stayed until after 1 a.m. on June 4.

The last alibi witness was Dwayne Lemons. Lemons is also employed at Federal Security and further corroborated the Shorts' testimony concerning defendant's presence at the party on June 3, 1993.

Next, Bonita Harris testified that she is defendant's wife and that the radio in their Blazer was not removed until sometime after June 12, 1993. She also stated that defendant was home at 12 a.m. on June 4, 1993.

Finally, defendant testified that on June 3, 1993, he was at Short's party from 7 or 8 p.m. until approximately 1:30 a.m. the next morning. On June 11, 1993, he was at Racine Food and Liquor from about 8 p.m. until 2 a.m. the next morning. He wore blue pants, blue shoes, a navy shirt, and a silver star. He denied abducting or assaulting D.W. or D.H.

After the defense rested and closing arguments were heard, the jury found defendant guilty of two counts of aggravated criminal sexual assault, two counts of criminal sexual assault, one count of aggravated kidnapping and one count of kidnapping. The court sentenced defendant to 25 years in the Illinois Department of Corrections for each count of aggravated criminal sexual assault to run consecutively. The court also sentenced defendant to 10 years for the aggravated kidnapping to run concurrently. This appeal followed.

Defendant first contends that the trial court erred in allowing the State to present evidence of D.H.'s assault, as defendant was only on trial for the assault of D.W. Defendant's argument fails for the following reasons.

■ The legal rules with respect to the admissibility of other crimes evidence are firmly established in Illinois. Generally, the admissibility of evidence is within the sound discretion of the trial court and should not be disturbed on review absent a clear abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). Evidence of collateral crimes for which an accused is not on trial is

inadmissible if it is offered merely to establish the defendant's propensity to commit a crime. *Illgen*, 145 Ill. 2d at 364, 583 N.E.2d at 519. However, such evidence is admissible if it is relevant to prove *modus operandi*, intent, identity, motive or absence of mistake. *Illgen*, 145 Ill. 2d at 364-65, 583 N.E.2d at 519.

■ In this case, the State claims D.H.'s testimony that she was sexually assaulted by defendant was relevant to show *modus operandi*. "Where evidence of prior bad acts is offered to prove *modus operandi* \*\*\*, there must be a high degree of identity between the facts of the crime charged and the other offense in which the defendant was involved. The two offenses must share such distinctive common features as to earmark both acts as the handiwork of the same person." *Illgen*, 145 Ill. 2d at 372-73, 583 N.E.2d at 523.

The two sexual assaults in this case share extraordinarily distinctive common features. Both victims were grabbed off the street in the same vicinity and forced into a black Chevrolet Blazer with a pink stripe on the side and wires hanging from the dashboard. Defendant identified himself as a police officer in both instances and told the women that they were under arrest. Defendant told them that he was looking for his partner. He handcuffed both women and made them sit on the floor of the vehicle with a coat over their heads while he drove for at least 45 minutes or an hour. Defendant also committed both assaults in the same wooded area.

Even the ugly details of the two assaults are almost identical: defendant ordered both victims to sit sideways on the passenger seat of his Blazer with their feet dangling out the door; he had forced sexual intercourse with both victims; he attempted to have anal intercourse with both victims; he then took both victims, still handcuffed and undressed, into the woods and left them next to their clothes; and he told both victims not to move until they could no longer see the lights on the Blazer. When the vehicle finally disappeared, the two women even went to the same house for help. This extensive list of identical and distinctive facts is sufficient to earmark both assaults as the crimes of the same person. See *Illgen*, 145 Ill. 2d at 372-73, 583 N.E.2d at 523.

Defendant claims that even if the evidence was relevant, its probative value was outweighed by its prejudicial effect. Specifically, defendant complains that approximately two-thirds of the testimony involved the assault to D.H.

Again, defendant's contention is without merit. It is true that the longest testimony came from Kevin Lumey, who testified as to the DNA evidence obtained after a Vitullo kit was prepared for D.H. However, the vast majority of this testimony pertained to DNA test-

ing generally and not to Lumey's specific conclusions in the case at bar. Such testimony was not prejudicial to defendant. It was necessary for the jury to understand the science by which DNA testing is conducted, and for that reason, the State had to go into some detail. Clearly, Lumey's conclusions were highly probative and were not outweighed by any prejudice to defendant. Therefore, the trial court did not abuse its discretion in allowing the evidence relating to the assault of D.H.

Defendant next claims that he was rendered ineffective assistance of counsel at trial for two reasons. First, defendant argues that trial counsel was ineffective for failing to request a limiting instruction for the jury in advance of the State's presentation of the other crimes evidence discussed above.

■ In order to establish ineffectiveness warranting a reversal, defendant must meet a two-prong test. He must show that (1) trial counsel's representation fell below an objective standard of reasonableness, and (2) there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984).

■ Here, the other crimes limiting instruction was ultimately given at the end of the case. At that time, the trial judge told the jury that the D.H. evidence "has been received on the issues of the defendant's identification and design and may be considered by you only for that limited purpose." Defendant cites no case, and indeed none exists in Illinois, where the court found that a defense attorney's failure to immediately request such an instruction constitutes representation falling below an objective standard of reasonableness. Furthermore, there is a strong presumption that jurors follow the instructions of the court (*People v. Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901, 913 (1995)), and nothing in the record rebuts that presumption. Therefore, defendant's claim fails under both *Strickland* prongs.

While we hold that defense counsel's failure to request a limiting instruction at the time the other crimes evidence was admitted does not amount to ineffective assistance of counsel, further comment is warranted. Evidence of other crimes, although relevant for some limited purpose in the case being tried, carries a risk of unfair prejudice to the defendant. The danger is that the jury will use the evidence for an improper purpose, such as to conclude that the defendant has a propensity to commit crime. *People v. Roe*, 228 Ill. App. 3d 628, 635, 592 N.E.2d 596, 601 (1992).

Trial judges should recognize the potential peril, whether or not defense counsel first proposes a limiting instruction. The best way to address the problem is to use the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992), taking care that the proper limited purpose of the evidence is used. We suggest trial judges heed the advice contained in *People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993): "Because of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, we hold that trial courts should not only instruct the jury in accordance with IPI Criminal [3d] No. 3.14 at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury."

Nonetheless, for the reasons discussed above, defense counsel's failure to request such an instruction in this case did not amount to ineffective assistance of counsel.

■ Defendant also contends that trial counsel was ineffective for failing to file a motion to suppress the lineup identification. In order to prevail on a motion to suppress an out-of-court identification, "a defendant must meet the burden of proving that the identification procedures were 'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.'" *People v. Miller*, 254 Ill. App. 3d 997, 1003, 626 N.E.2d 1350, 1356 (1993), quoting *People v. Blumenshine*, 42 Ill. 2d 508, 511, 250 N.E.2d 152, 154 (1969). This is a heavy burden that defendant's trial counsel would not have been able to meet had he filed a motion to suppress, and perhaps that is why he elected not to do so.

■ The failure to file a motion to suppress will not warrant a reversal if the State can show that the identification was reliable. *People v. Moore*, 266 Ill. App. 3d 791, 797, 640 N.E.2d 1256, 1260 (1994). In determining reliability, the court should consider (1) the opportunity of the witness to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the witness's level of certainty at the time of the identification, and (5) the length of time between the crime and the identification. *Moore*, 266 Ill. App. 3d at 797, 640 N.E.2d at 1260.

■ Considering these factors in this case, D.W.'s identification of defendant in the pretrial lineup was clearly reliable. D.W. testified that she had ample opportunity to view defendant as he grabbed her off the street in a very well-lit area and drove the Blazer for more than an hour. Also, it is clear that D.W. was highly attentive during this period because she provided considerable detail in describing her attacker to Lieutenant Kohn on the night of the assault. Further-

more, her description closely matched defendant. Lieutenant Kohn testified that D.W. was very certain at the time of the identification because she identified defendant immediately upon seeing the lineup. Finally, the lineup occurred only five days after the assault, surely a short enough time for D.W. to remember her assailant's face.

Because the lineup was not unnecessarily suggestive and D.W.'s identification of defendant was reliable, defense counsel's failure to file a motion to suppress the lineup identification did not constitute ineffective assistance of counsel.

■ Lastly, defendant contends that the State committed reversible error in making certain remarks during closing arguments. Specifically, defendant cites the following statement by the prosecutor:

"We presented overwhelming physical evidence to you, ladies and gentlemen in this case, and I have seen absolutely no physical evidence to corroborate what this defendant told you today, not one pay stub, not one schedule shown you he was working at that time. Why, because it's concocted."

Defendant's contention that these remarks improperly shifted the burden of proof onto him is unfounded. The State is entitled to wide latitude during closing arguments. *People v. Fields*, 135 Ill. 2d 18, 64, 552 N.E.2d 791, 812 (1990). Clearly, the prosecutor may comment during closing arguments on the credibility of the defendant and other defense witnesses. Here, defendant put forth an alibi defense. The State was entitled to attack the alibi testimony.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WOLFSON and BRADEN[1], JJ., concur.

---

[1]Justice Braden concurred in the disposition of this appeal before his reassignment to the circuit court of Cook County.