THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILBERT JACKSON, Defendant-Appellant.

First District (4th Division)    No. 1—02—3105

Opinion filed April 28, 2005.

REID, P.J., dissenting.

Theodore Godfrey, Michael J. Pelletier, and Christopher W. Buckley, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Wilbert Jackson was convicted of the first degree murder of Terry Johnson and sentenced to 55 years in prison. On appeal, defendant contends that: (1) he was denied his right to a fair trial where the trial court refused his limiting instruction on evidence of gang involvement and failed to instruct the jury regarding the use of evidence pertaining to gang involvement and collateral offenses; (2) he was denied his right to a fair trial where the prosecutor made improper closing remarks which inflamed the jury; (3) the trial court erred by denying his claim that the prosecutor used peremptory challenges to discriminate against prospective African-American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); and (4) his sentence is excessive. For the following reasons, we affirm.

## I. Background

At trial, Tomiesene Johnson testified that on February 16, 1994, she lived with her sons Terry and Linus Johnson at 747 North Long

Avenue in Chicago. Between 7 and 8 p.m., Tomiesene and Linus were watching television at home, while Terry was in the bathroom. After the doorbell rang, Linus and Terry went to the front door and stepped outside. Shortly thereafter, Tomiesene went to the door and handed Terry a sweater because it was cold outside. She saw Terry and Linus standing outside on the front porch of the house with defendant. Tomiesene became suspicious of defendant because he had never visited her house before and was much younger than her sons. Tomiesene walked back into the house and decided to call the police. As she picked up the telephone, Tomiesene heard a gunshot coming from the front porch. Tomiesene called the police and then saw Linus run into the house with defendant following him, brandishing a gun. Linus knocked over the dining room table and hid behind it while defendant attempted to fire the gun at him. Tomiesene heard the gun click but it did not fire any bullets. After she told defendant not to shoot Linus, defendant said, "Shut up, bitch. I will shoot you." Defendant then pointed the gun at Tomiesene's head and tried to shoot her, but again the gun clicked and did not fire. Defendant attempted to shoot Tomiesene and Linus several more times. Tomiesene then told Linus that the gun was not firing and that they should try to "get" defendant. Defendant walked backwards toward the front door with the gun pointed at Tomiesene and Linus, then left the house.

Tomiesene then saw Terry lying on the ground outside the house, bleeding from a wound to his neck and unable to move. Terry was taken to the hospital, where Tomiesene was informed that he was in a coma and unable to breathe on his own. Terry remained in the same condition until he died in a nursing home on May 15, 1998.

Linus Johnson testified that he knew a man named Lawrence Miller, whose nickname is "Speedy," because he lived across the street from his mother's house. During the few months prior to February 1994, Linus had an affair with Miller's wife while Miller was in jail. Linus testified that he was unaware that the woman he was having an affair with was Miller's wife and he ended the affair when he learned this information. After Miller was released from jail, he threatened and attempted to fight Linus. On February 14, 1994, Linus and Terry went to the police station and filed a report against Miller.

On February 16, 1994, Linus was watching television with his mother at her home while Terry was in the bathroom getting ready to go roller-skating. After the doorbell rang, Linus went to the front door and saw defendant standing on the porch. Linus then spoke with defendant on the front porch. Defendant asked Linus if he had a "beef" with Miller and Linus responded "not really." Defendant told Linus that Miller was "jumped" by members of the "Vice Lord" street

gang. Linus responded that nothing like that had happened. Following this conversation, Terry walked out onto the front porch and told defendant that he knew defendant had come over to talk about Linus and Miller's wife. Defendant said that he was a "peacemaker." Tomiesene then came to the front door and handed Terry a jacket.

Shortly thereafter, Linus and Terry saw Miller standing across the street beside a tree. Terry yelled to Miller and said "let's get this all in the open." Miller walked up to the porch and said "do it." Defendant pulled a gun out of his jacket pocket and fired it at Terry's head. Defendant then pointed the gun at Linus's head and chased him into the house. Linus turned over the dining room table and hid behind it while defendant attempted to shoot him. Linus heard Tomiesene tell defendant not to shoot him and then defendant threatened to shoot Tomiesene. Linus heard the gun make clicking noises several times and Tomiesene told him that the gun was "jammed." Linus stood up from behind the table and chased defendant out of the house. Linus then went to assist Terry, who was lying on the ground, bleeding from a gunshot wound.

John Santopadre testified that on February 16, 1994, he was employed as a detective with the Chicago police department. Between 8 and 8:30 p.m., he was assigned to respond to the area of 747 North Long Avenue. When he arrived at the scene, the victim had already been taken to the hospital. Santopadre observed a large pool of blood at the base of the front porch and that the dining room table inside the house was overturned on its side. When Santopadre went to the hospital, he was informed that the victim had been shot in the right side of the neck and was paralyzed and unconscious. The detective subsequently asked police officers to look for defendant in connection with this case.

Detective Robert Rutherford testified that in May or June 1998, he became involved in the investigation of the shooting in this case, shortly after the victim's death. On June 25, 1998, Detective Rutherford interviewed defendant at the police station. After advising defendant of his *Miranda* rights, Detective Rutherford asked him about the events on February 16, 1994. Defendant told the detective that on that date he was standing on the porch of a house located at 747 North Long Avenue with Terry and Linus. While defendant was talking to Terry and Linus, an unknown individual fired a gun from across the street and a bullet struck Terry. Defendant then fled from the area. Defendant denied chasing Linus into the house, possessing a gun or confronting Tomiesene on the date in question.

During a second interview on the same day, defendant told Detective Rutherford that he went to Long Avenue on the date in question

to meet Lawrence Miller, who was called "Speedy." Miller told defendant that he was upset with Linus and planned on going to his house. Miller then lifted up his jacket and shirt and showed defendant a handgun that was tucked into his waistband. Defendant went with Miller to confront Linus to "try to keep the peace." Defendant and Miller spoke with Terry and Linus on the porch of their home for about 20 seconds, then Miller removed the handgun from his waistband and shot Terry. Miller then handed defendant the gun and he entered the house with his hands outstretched to tell Terry's family members that he did not shoot him. After hearing screaming inside the house, defendant fled from the area and gave the handgun to someone whose name he could not recall.

During a final interview with defendant, Detective Rutherford asked him about the "Black P Stone Nation" street gang. Defendant told the detective that he was a member of the "Shorty Black P Stone Nation" and that Miller was a high-ranking general in the street gang. Defendant stated that according to the gang's rules, any gang member Miller instructed to kill someone would be obligated to do so. Detective Rutherford asked defendant whether he would have shot Terry if Miller told him to do so. Defendant responded that it would depend on the reason that Miller wanted to shoot Terry. Defendant stated that if Linus was having an affair with Miller's wife, it was a sufficient reason for him to follow Miller's order to shoot him. Defendant then denied shooting Terry.

Assistant State's Attorney (ASA) Lynn McCarthy testified that on June 25, 1998, she interviewed defendant at the police station. After advising defendant of his *Miranda* rights and informing him that she was a prosecutor, ASA McCarthy asked defendant about the date in question. Defendant told her that on February 16, 1994, he was walking home when he saw Miller, who told him that he was upset with Terry and Linus. Miller lifted up his shirt and showed defendant a gun that was tucked into his waistband, then told defendant that he was going to see Terry and Linus. Defendant went with Miller to Terry and Linus's house and watched Miller have a conversation with Linus and Terry on their porch. Miller then shot Terry and handed the gun to defendant. Defendant followed Linus into the house, then Linus and Tomiesene began screaming and Linus turned over a table for protection. Defendant ran from the house and hid the gun in a truck tire in the alley. Defendant later retrieved the gun and gave it to a member of the "Stones" street gang. Defendant told ASA McCarthy that he, Miller and Linus belonged to the "Stones" street gang and that Miller was upset with Linus because he dated Miller's girlfriend while he was in jail.

Dr. Tae An testified that on May 16, 1998, he performed an autopsy on the victim. During the external examination, Dr. An observed that the victim had a wound on the back of his neck that was surrounded by a large area of scarring. During the internal examination, Dr. An observed that the victim's spinal cord was damaged and shrunken and his brain was shrunken. After reviewing the victim's medical records, Dr. An determined that the victim had sustained a gunshot wound on the right side of his neck that exited his right upper back near his spine. The victim became paralyzed below the upper chest and developed brain anemia due to a lack of oxygen and blood loss. The victim also developed a large blood clot in his neck. Dr. An stated that his opinion was that the victim died from the gunshot wound to his neck and that the manner of death was homicide. Dr. An also testified that the victim's heart stopped beating due to complications that resulted from the gunshot wound.

The parties then stipulated that, if called to testify, June Flees-Dakuras would testify that she was employed as a court reporter and took down the verbatim testimony of Tomiesene on May 2, 1994. The parties also stipulated that Tomiesene testified that she knew Miller on February 16, 1994, and that Miller ran into her house on that date before Linus and defendant had entered the house. Defendant rested without presenting any witnesses.

The jury subsequently found defendant guilty of first degree murder. At the sentencing hearing, the State introduced evidence of defendant's prior juvenile adjudications for battery, gang recruitment and possession of a stolen motor vehicle and adult felony conviction for burglary. The State also introduced victim impact statements from Tomiesene and Linus. Defense counsel argued in mitigation that defendant was 25 years old and had a good relationship with his family and a woman he planned on eventually marrying. Defense counsel also argued that defendant studied auto mechanics and for his GED while he was in juvenile custody and that education and studying the Bible were defendant's priorities. Defense counsel further argued that defendant's criminal conduct was induced and facilitated by Miller. Defendant then apologized for his involvement in the victim's death and asked for leniency in sentencing. Based on this evidence, the trial court sentenced defendant to 55 years in prison.

## II. ANALYSIS

### A. Defendant's Claim That the Trial Court Improperly Refused to Submit His Limiting Instruction on Gang Involvement to the Jury and Failed to Instruct the Jury on the Use of Gang and Other Crimes Evidence

Defendant first contends that he was denied his right to a fair

trial where the trial court allowed the State to present evidence of defendant's gang involvement and collateral offenses against Linus and Tomiesene, to show motive and intent for the charged offense, but refused defendant's limiting instruction on gang involvement and failed to instruct the jury on the proper use of this evidence.

The record shows that, at the jury instruction conference, defendant proposed a modified version of Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000) (Function of Court, Jury and Counsel) (hereinafter IPI Criminal 4th No. 1.01), be submitted to the jury. Defendant proposed that the instruction provide the following:

"Evidence has been received concerning the Defendant's alleged gang involvement. This was received for a limited purpose and should not be considered by you for any other purpose."

The trial court denied defendant's request for this instruction. In doing so the court noted that the only purpose for the instruction would be to let the jury know that it should not be biased against defendant based on his alleged gang membership, which was done during *voir dire*. The court also noted that the proposed instruction was not a pattern instruction.

Defendant contends that this proposed instruction conveyed the essential language contained in IPI Criminal 4th No. 3.14 (Proof of Other Offenses or Conduct), which informs the jury: "Evidence has been received that the defendant has been involved in offenses [or] conduct other than those charged in the indictment. This evidence has been received on the issues of the defendant's identification, presence, intent, motive, design, or knowledge and may be considered by [jurors] only for that limited purpose. It is for [the jurors] to determine whether the defendant was involved in those offenses [or] conduct and, if so, what weight should be given to this evidence on the issues of [defendant's identification, presence, intent, motive, design, or knowledge.]" Defendant also notes that the committee notes to IPI Criminal 4th No. 3.14 refer to gang involvement as "conduct" within the meaning of the instruction. See IPI Criminal 4th No. 3.14, Committee Note, at 103.

Defendant, therefore, argues that his proposed instruction should have prompted the circuit court to use the limiting instruction contained in IPI Criminal 4th No. 3.14 to instruct the jury that the evidence relating to defendant's membership in a street gang should only have been considered for the limited purpose of showing motive or intent for the charged offense.

Defendant concedes that the evidence of other crimes and defendant's gang membership was admissible in this case to show motive or intent to commit the charged offense. See *People v. Tolbert*, 323

Ill. App. 3d 793, 797 (2001). However, defendant maintains that he was denied a fair trial where the circuit court failed to provide a limiting instruction regarding evidence of gang membership and the State focused on this evidence throughout trial and during closing arguments.

This court has recognized that evidence of other crimes or conduct, although relevant for some limited purpose in the case being tried, carries a risk of unfair prejudice to the defendant. See *People v. Harris*, 288 Ill. App. 3d 597, 605 (1997). "The danger is that the jury will use the evidence for an improper purpose, such as to conclude that the defendant has a propensity to commit crime." *Harris*, 288 Ill. App. 3d at 605. In *Harris*, we acknowledged that "[t]he best way to address the problem is to use the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992), taking care that the proper limited purpose of the evidence is used." *Harris*, 288 Ill. App. 3d at 606.

■ In this case, the trial court's failure to instruct the jury, pursuant to IPI Criminal 4th No. 3.14, that the evidence relating to defendant's membership in a street gang should only have been considered for the limited purpose of showing defendant's identification, presence, intent, motive, design, or knowledge was an error. This is so even though defendant's trial counsel submitted a modified IPI Criminal 4th No. 1.01 instruction rather than requesting the appropriate IPI Criminal 4th No. 3.14 instruction.

"However, an error in a jury instruction is harmless if the result of the trial would not have been different if a proper instruction was given." *People v. Markiewicz*, 246 Ill. App. 3d 31, 44 (1993). " 'Generally, the only instructions necessary to ensure a fair trial include the elements of the crime charged, the presumption of innocence, and the question of burden of proof.' " *Tolbert*, 323 Ill. App. 3d at 800, quoting *People v. Hooker*, 253 Ill. App. 3d 1075, 1085 (1993). Here, the proffered instruction did not concern any of these areas and, thus, the error in this case was harmless.

In addition, the error was harmless where the evidence was not closely balanced. Tomiesene testified that on the date in question, she saw defendant standing on her front porch with Linus and the victim. Shortly thereafter, Tomiesene heard a gunshot, then saw defendant, holding a gun, chase Linus into her home. Tomiesene then saw defendant attempt to fire the gun at Linus and Linus turn over the dining room table to hide behind. When she objected, defendant attempted to shoot her with the gun. After defendant left the house, Tomiesene saw the victim lying outside on the ground, bleeding from a wound to his neck. Linus also testified that defendant was standing

with him and the victim on the front porch of his mother's home. Linus saw defendant take a gun out of his jacket pocket and fire it at the victim's head. Defendant then pointed the gun at Linus's head and chased him into the house. Linus's further testimony then mirrored that of Tomiesene. Their testimony was corroborated by other witnesses who testified that the table in the dining room was turned over and that the victim sustained a gunshot wound to the neck. On this basis, we find that any error resulting from the failure to instruct the jury on the limited purpose for which the evidence of gang involvement was received would not have affected the outcome of the trial.

■ Defendant also contends that he was denied a fair trial where the trial court failed to instruct the jury regarding the proper use of the evidence of the collateral offenses against Linus and Tomiesene. Defendant never raised the issue of this limiting instruction at trial or in a written posttrial motion. As a result, this issue is waived for appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). However, defendant requests that this court consider the merits of the issue under the plain error rule where the State focused on this evidence at trial and defendant suffered prejudice.

Pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), this court may review an argument not properly preserved if plain error has occurred. *People v. Todd*, 154 Ill. 2d 57, 70 (1992). The plain error rule allows a reviewing court to consider a trial error not properly preserved under two limited circumstances: (1) where the evidence is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial. *People v. Harvey*, 211 Ill. 2d 368, 387 (2004); 134 Ill. 2d R. 615(a). However, we find, as previously discussed, the evidence in this case was not closely balanced and decline to review defendant's claim under the first prong of the plain error rule.

The second prong of the plain error rule is invoked only in cases of serious errors that severely threaten the fundamental fairness of the defendant's trial. *Hopp*, 209 Ill. 2d at 8. Here, defendants' claim of error is not of such a character to invoke the plain error rule under the second prong where the evidence in this case was overwhelming and a jury instruction regarding evidence of other crimes was not necessary to ensure defendant a fair trial. *Tolbert*, 323 Ill. App. 3d at 800.

■ In order to circumvent the waiver rule, defendant contends that trial counsel was ineffective by failing to request a jury instruction regarding the evidence of collateral offenses.

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation was deficient and that the asserted deficiency in counsel's performance prejudiced

the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

"The failure of an attorney to seek a limiting instruction when he is entitled to one is not a matter of discretion or trial strategy." *People v. Hooker*, 253 Ill. App. 3d 1075, 1085 (1993). However, where evidence is admissible at trial, defense counsel is not required to perform the useless act of objecting to this evidence, and his conduct cannot be faulted for such failure. *People v. Singleton*, 217 Ill. App. 3d 675, 689 (1991). Here, had trial counsel asked for a limiting instruction, it would have been denied.

Our supreme court has held that evidence of other offenses is admissible if it is relevant for "any purpose other than to show the propensity to commit crime." *People v. Illgen*, 145 Ill. 2d 353, 365 (1991). Such evidence is relevant where it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence. *People v. Green*, 322 Ill. App. 3d 747, 757 (2001).

Furthermore, evidence of another offense is admissible where it is an intrinsic part of the testimony concerning the crime at trial. *People v. Bush*, 29 Ill. 2d 367, 374 (1963). In fact, when evidence tends to prove a material fact in issue, it is admissible even though it also shows other technically distinct felonies. *People v. Lawler*, 23 Ill. 2d 38, 40 (1961). Testimony that tends to show the defendant guilty of the crime charged is admissible, even though it tends to show the defendant guilty of another offense. *People v. Cross*, 96 Ill. App. 3d 268, 272 (1981).

The evidence relating to defendant's attempts to shoot Linus and Tomiesene was relevant to show defendant's intent to commit murder. *People v. Charles*, 238 Ill. App. 3d 752, 761-63 (1992). In *Charles*, the defendant's intent to commit murder could be derived from the fact that he intentionally fired a shotgun into one person's abdomen 15 minutes before he fired the same shotgun into the victim's abdomen. Similarly, in this case, the evidence that defendant attempted to shoot Linus and Tomiesene moments after shooting the victim was relevant to show defendant's intent to commit murder.

Here, defendant's attempts to shoot Linus and Tomiesene occurred contemporaneously with the shooting of Terry. Under the facts of this case, it is difficult to discern in what manner the jury should have been instructed as to which issues this evidence should have been

limited to. Defendant's attempts to shoot Linus and Tomiesene were admissible in this case: (1) to show knowledge; (2) to show intent; (3) to show defendant's state of mind; (4) to show motive; (5) to negative absence of intent or innocent frame of mind; (6) to establish identity; (7) to show the furtherance of a conspiracy between defendant and Miller; (8) to contradict the defendant's denials; (9) to place the defendant in proximity to the crime; (10) to show other offenses that were connected with the present charge; (11) to show the circumstances of the crime charged; and (12) to show defendant's attitude toward the victim. See R. Hunter, Trial Handbook for Illinois Lawyers, Criminal § 31.2, at 420 (6th ed. 1989).

In this case, "where the trial court properly admitted evidence of other criminal acts that occurred at the same time and place and that were related to the criminal action for which the defendant was being tried, no limiting instruction [was] required." *People v. Figueroa*, 341 Ill. App. 3d 665, 672 (2003). This is particularly true where the acts complained of as evidence of other crimes arose from the very same transaction or set of circumstances as the primary criminal act; in this case, the murder of Terry. *Figueroa*, 341 Ill. App. 3d at 672.

Considering the multitude of bases upon which the evidence of defendant's attempts to shoot Linus and Tomiesene was relevant, and therefore admissible, defendant was not entitled to a limiting instruction addressing defendant's attempts to shoot Linus and Tomiesene.

### B. Defendant's Claim That the State Made Improper Closing Remarks Which Inflamed the Jury

■ Defendant next contends that he was denied a fair trial where the State made improper closing remarks relating to evidence of gang activity and the collateral offenses against Tomiesene and Linus. Defendant specifically argues that the State inflamed the jury by arguing that defendant was a "hero" to his gang for following orders by shooting the victim and stating that it was "a miracle that there aren't three dead bodies." Defendant also argues that the State improperly argued that "Fate, God, something did spare Tomiesene and Linus Johnson, and you were able to hear from them. Do not tell them that their being spared does not matter."

"Initially, it must be noted that the defendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument." *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002). A prosecutor has wide latitude in making closing remarks and may comment on the evidence and draw all legitimate inferences from the evidence, even if unfavorable to the defendant. *People v. Bell*, 343 Ill. App. 3d 110, 116 (2003). Improper

remarks will not merit reversal unless a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that real justice was denied or that the verdict may have resulted from the error. *People v. Evans*, 209 Ill. 2d 194, 225 (2004). "The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." *Williams*, 332 Ill. App. 3d at 266.

Applying these principles to the present case, we find that defendant's claims of error are without merit. The allegedly inappropriate comments where based upon the evidence or legitimate inferences drawn from the evidence. The first comment describing defendant as a "hero" for following gang orders and shooting the victim is a reasonable inference from the evidence presented at trial that defendant and Miller were members of the same gang and defendant shot the victim after gang leader Miller said "do it." Further, in defendant's statement to Detective Rutherford, he admitted that he would have been obligated to shoot the victim if Miller had ordered him to do so.

The second allegedly improper comment, that it was a "miracle that there aren't three dead bodies," was also properly based on the evidence at trial. After shooting the victim, defendant repeatedly attempted to shoot Tomiesene and Linus but the gun would not fire. Similarly, the final comment, that Tomiesene and Linus Johnson were able to testify at trial because "fate" or "God" spared them, was also an inference from the evidence at trial that defendant attempted to shoot these individuals. Accordingly, we find no reversible error.

## C. Defendant's *Batson* Claim

■ Defendant next contends that this court should remand this case for a new hearing on his *Batson* motion, which alleged that the State misused its peremptory jury challenges in a racially discriminatory manner. Defendant specifically argues that the State's failure to explain its reasons for excluding one of the African-American prospective jurors constituted reversible error.

*Batson* establishes a three-step analysis to determine whether the State used its peremptory challenges to remove venirepersons on the basis of race. *People v. Easley*, 192 Ill. 2d 307, 323 (2000). A defendant objecting to the State's use of peremptory challenges must first establish a *prima facie* case of purposeful discrimination during jury selection by demonstrating that relevant circumstances raise an inference that the State exercised peremptory challenges based upon prospective jurors' race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88,

106 S. Ct. at 1723; *People v. Primm*, 319 Ill. App. 3d 411, 419 (2001). In considering whether a party has established a *prima facie* case, courts consider: (1) the racial identity between the defendant and the excluded venirepersons; (2) a systematic pattern of strikes against black venirepersons; (3) a disproportionate use of peremptory challenges against black venirepersons; (4) the level of black representation in the venire as compared to the jury; (5) the opposing counsel's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses. *Primm*, 319 Ill. App. 3d at 419-20.

If the defendant establishes a *prima facie* case, the burden shifts to the State to articulate a race-neutral explanation for challenging the venirepersons in question. If the State provides a race-neutral explanation, the trial judge must consider this explanation and determine whether the complaining party has established purposeful racial discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24. The trial judge's determination on the ultimate issue of discrimination is entitled to great deference and will not be disturbed unless it is clearly erroneous. *Primm*, 319 Ill. App. 3d at 420.

The record in this case shows that defendant made two *Batson* motions during *voir dire*. The first motion was made after the State exercised three peremptory challenges, excluding two African-American venirepersons. Defendant argued that two-thirds of the State's challenges were exercised to exclude African-American venirepersons. The State had initially attempted to exclude one of these African-American venirepersons, Kevin Crain, for cause because his uncle had been charged with murder. When this motion was denied, the State exercised a peremptory challenge to exclude Crain. Defendant also argued that there was no basis to exclude the other African-American venireperson, Shevahn McNeil. When the trial court asked the State to respond to defendant's motion, the State reminded the court that it would first have to find that defendant presented a *prima facie* case of purposeful discrimination in jury selection before requiring an explanation for the peremptory challenges from the State or the three stages of the *Batson* inquiry would collapse. The trial court denied defendant's motion and explained "I don't see a problem with Crain. He had an uncle that was murdered. *** McNeil is the only one, and I don't think one is enough." (The judge misspoke when he said that Crain's uncle had been a murder victim as opposed to having been charged with murder.)

During the selection of alternate jurors, defendant renewed his *Batson* motion after the State exercised its fourth peremptory challenge to exclude a third African-American venireperson, Floyd Armstrong. When asked to respond, the State reminded the court that it was required to first make a finding of a pattern of racially motivated strikes. The State also responded that it excluded Armstrong based on his social and volunteer activities at the Cook County jail. The trial court denied defendant's renewed motion and, in doing so, stated that it did not find "any racially motivated reasons."

On appeal, defendant now contends that the trial court erred in finding no racial discrimination where the State failed to offer a race-neutral reason for excluding prospective juror McNeil. Defendant maintains that during his renewed *Batson* motion, the trial court collapsed the three steps of the inquiry and made a third-stage determination that no racial discrimination existed.

The record shows that during defendant's renewed *Batson* motion, the trial court failed to follow the steps of the *Batson* process. As previously mentioned, *Batson* establishes a three-step analysis to determine whether the State used its peremptory challenges to remove venirepersons on the basis of race. First, the defendant must establish a *prima facie* case of purposeful discrimination by showing that the State exercised its peremptory challenges to remove members of a cognizable racial group from the venire. *People v. Easley*, 192 Ill. 2d at 323. Second, if a *prima facie* case is made, the burden then shifts to the State to articulate a race-neutral explanation for excusing the venireperson. *Easley*, 192 Ill. 2d at 323-24. Once the State articulates its reasons for excusing the venireperson in question, the process moves to the third step, where the trial court determines whether the defendant has carried his burden of establishing purposeful discrimination. *Easley*, 192 Ill. 2d at 324. In this case, the trial court improperly collapsed the *Batson* hearing when it requested that the State provide race-neutral reasons for its challenges prior to finding that a *prima facie* case had been established, then made a determination regarding the question of purposeful discrimination. *People v. Rhoiney*, 252 Ill. App. 3d 320, 329 (1993).

However, defendant did not raise the State's failure to articulate a race-neutral reason for excluding McNeil at trial or in a posttrial motion and, therefore, has forfeited his right to raise it on appeal. *Primm*, 319 Ill. App. 3d at 422-23. In *Primm*, this court held that the defendant, who raised multiple *Batson* challenges, forfeited his claim with respect to one venireperson where he did not object to the State's failure to articulate a race-neutral reason for challenging that venireperson. *Primm*, 319 Ill. App. 3d at 423.

Defendant asserts that this court should not find forfeiture of his *Batson* claim as to McNeil where he was prevented from raising this issue because the trial court collapsed the three stages and made a determination on the question of discrimination immediately after asking the State to respond to defendant's *Batson* claim. We agree with defendant that the trial court improperly collapsed the three stages of the *Batson* hearing. Our supreme court has warned against such collapsing of what ought to be a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions. *People v. Garrett*, 139 Ill. 2d 189, 201 (1990).

However, defense counsel should not be permitted to obtain a reversal of the defendant's conviction simply by failing to object and by design depriving the trial court of the opportunity to prevent or correct the error. *Primm*, 319 Ill. App. 3d at 424. Here, the trial court may have been able to cure the alleged error had defendant raised an objection at trial or presented the issue in a posttrial motion. Also, the State may have articulated a race-neutral reason for excluding McNeil. Accordingly, we find that defendant forfeited his *Batson* claim with respect to McNeil by failing to raise the issue at trial.

Furthermore, we decline to consider defendant's claim under the plain error doctrine. A reviewing court will review an issue under the plain error doctrine if the evidence is closely balanced or if the alleged error was so serious that it deprived the defendant of a fair trial. *Primm*, 319 Ill. App. 3d at 424. When applying the first prong, as previously discussed, the evidence in this case was not closely balanced.

"We also find that defendant fails to meet the second prong. A reviewing court will grant relief under this prong only when the error is so fundamental to the integrity of the judicial process and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." (Emphasis omitted.) *Primm*, 319 Ill. App. 3d at 424. While discrimination during jury selection raises serious questions as to the fairness of a judicial proceeding (*Primm*, 319 Ill. App. 3d at 424), the trial court in this case could have cured the alleged error had defendant raised an objection. In addition, it is possible that the State may have articulated a race-neutral reason for excusing McNeil. Accordingly, we find that defendant's claim does not warrant review under the plain error doctrine.

### D. Defendant's Claim That His Sentence Is Excessive

■ Defendant lastly contends that the imposition of a 55-year prison sentence for first degree murder was excessive given his young

age, limited criminal background, significant rehabilitative potential and subordinate role in initiating the murder.

The trial court's determination as to the appropriate punishment is entitled to great deference and will not be altered absent an abuse of discretion. *People v. Illgen,* 145 Ill. 2d 353, 379 (1991). Factors relevant to the sentencing determination include the nature of the crime, protection of the public, deterrence and punishment, as well as the defendant's rehabilitative potential. *People v. Whitehead,* 171 Ill. App. 3d 900, 908 (1988).

In this case, defendant was convicted of first degree murder and sentenced to a prison term within the statutory parameters set for that offense. 730 ILCS 5/5—8—1(a)(1) (West 2000). The record shows that the mitigating factors presented here were brought to the attention of the court and given due consideration. In addition to the presentence investigation report and the arguments in mitigation, the court also considered the seriousness of the crime, the protection of society and the need to deter this type of criminal conduct. The court specifically noted that defendant killed the victim at the direction of a superior gang member, which was similar to a "murder for hire" scheme. The court also considered the evidence that, after shooting the victim, defendant attempted to shoot Linus and Tomiesene, which demonstrated very little respect for life.

Although rehabilitation must be considered as an objective of a sentence (*People v. Norfleet,* 259 Ill. App. 3d 381, 395 (1994)), the court is not required to give greater weight to the defendant's rehabilitative potential than it gives to the seriousness of the crime (*People v. Watkins,* 325 Ill. App. 3d 13, 21 (2001)). The record reflects that the court's determination was properly based on weighing the relevant sentencing factors and the need to protect society. It is not the function of this court to reweigh those factors and independently conclude that the sentence is excessive (*People v. Burke,* 164 Ill. App. 3d 889, 902 (1987)) or to substitute our judgment for that of the trial court (*People v. Pittman,* 93 Ill. 2d 169, 178 (1982)).

## III. CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County. As part of our judgment, we grant the State's request and assess defendant $100 as costs of this appeal.

Affirmed.

THEIS, J., concurs.

330

PRESIDING JUSTICE REID, dissenting:

I dissent. In particular, I cannot stand with the majority on the circular reasoning it implements so as to not review the *Batson* issue under plain error.

The doctrine of plain error allows this court to review errors which were not sufficiently raised below. Here, it is obvious that the alleged error which the defendant complains of, striking jurors on the basis of race, is an error which is so serious that it deprives a defendant of a fair trial. Furthermore, it is obvious and the majority concedes that the trial court did not handle this issue properly. However, for reasons which I cannot understand, the majority states that it will not review this issue because, "While discrimination during jury selection raises serious questions as to the fairness of a judicial proceeding [citation], the trial court in this case could have cured the alleged error had defendant raised an objection." 357 Ill. App. 3d at 328.

This is the reason that the plain error doctrine exists. Plain error is to be employed when: (1) the evidence is closely balanced, or (2) the alleged error was so serious that it deprived the defendant of a fair trial. That is it. There is no third prong which states: (3) plain error will not be used when the defendant could have raised the issue below and did not.