NOTICE

Decision filed 01/26/21 The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180511-U

NO. 5-18-0511

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-CF-121 |
| | ) | |
| TERRILL A. WALKER, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held*:    We reverse the defendant's convictions and sentences, and remand for a new trial, because even if we assume, *arguendo*, that the assortment of propensity and other-crimes evidence that was introduced at the defendant's trial was admissible, we nevertheless conclude that the defendant received ineffective assistance of trial counsel where trial counsel failed to ask for a limiting instruction with regard to the proper consideration of that evidence by the jury, and where there is a reasonable probability that a more favorable result would have been obtained absent trial counsel's errors.

¶ 2    The defendant, Terrill A. Walker, appeals his convictions and sentences after a jury trial in the circuit court of Jackson County in which he was found guilty of two counts of unlawful possession of a weapon by a felon and subsequently was sentenced to eight years' imprisonment on each count, to be served concurrently and to be followed by one year of mandatory supervised

1

release.[1] For the following reasons, we reverse the defendant's convictions and sentences and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4     The facts necessary to our disposition of this direct appeal are as follows. The defendant was charged by an information filed on March 21, 2017, with two counts of unlawful possession of a weapon by a felon, with one count alleging unlawful possession of a handgun, and the other count alleging unlawful possession of a rifle. On April 13, 2017, at the defendant's preliminary hearing, testimony was adduced that the charges against the defendant stemmed from, *inter alia*, an investigation into identity theft, with investigating officers believing that the defendant, who was wanted on a federal warrant, had attempted to assume the identity of Bruce Outlaw and appeared to be living in an apartment under Outlaw's name. Testimony also was adduced that when police later made contact with Outlaw, Outlaw told them that he had rented the apartment for the defendant, because Outlaw had a clean record and could pass a background check for the apartment. Outlaw stated that he did not live at the apartment. The officers concluded that there was no reason to continue the identity theft investigation, because it did not appear that Outlaw's identity had been compromised.

¶ 5     On April 2, 2018, at the outset of the defendant's jury trial, prior to the selection of the jury, the trial judge noted that the parties had stipulated that the jury would be told that the defendant "was convicted of a felony offense prior to March 16, 2017." After the parties offered argument with regard to what other prior convictions might come in, the trial judge ruled that the

---

[1]Records from the Illinois Department of Corrections, of which we may take judicial notice (see, *e.g.*, *People v. DuPree*, 353 Ill. App. 3d 1037, 1047 (2004)), show that the defendant has nearly completed his concurrent sentences in this case. However, this matter is not moot because, *inter alia*, "the completion of a defendant's sentence renders a challenge to the sentence moot, but not a challenge to the conviction." *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005).

State could impeach the defendant with his two drug-possession convictions, one a federal conviction from 1999, the other a state conviction from a 2017 case. The trial judge also ruled that the State could elicit testimony from the police that they were aware of a "warrant" for the defendant's arrest, in order to explain why they were looking for him at the time of his arrest. Counsel for the State noted that he would ask the State's witnesses not to mention the fact that the defendant was on federal parole at the time he was arrested in this case.

¶ 6       When counsel for the State delivered his opening statement to the jury the next morning, he gave a brief overview of what he believed the jury would hear, stating, *inter alia*, that "officers were looking for the defendant because the defendant had outstanding warrants." He also told the jury that officers learned the defendant might be staying at a certain apartment in Carbondale. However, they learned that the apartment was not rented in the name of the defendant. Nevertheless, when officers received a "general physical description" from the apartment manager of the man the manager knew to be the resident of that apartment, the officers "had an idea that maybe it was actually the defendant." There was no objection from the defendant's trial counsel to these statements. After opening statements were delivered, the trial judge read to the jury the parties' stipulation that the defendant "was convicted of a felony offense prior to March 16, 2017." The testimony of witnesses then began.

¶ 7       The first witness to testify for the State was Bruce Outlaw Jr., who testified that he had known the defendant for approximately 25 years and considered him an associate rather than a friend. Outlaw testified that in December 2016, the defendant asked Outlaw to help the defendant "find a place to stay." When asked if he knew "anything about the defendant's prior criminal history," Outlaw testified, "Not really." When asked what he did to help the defendant, he testified that he signed a lease for an apartment. He did not live in the apartment but talked to the management of the apartment complex, told them he would be living there, filled out the lease

3

application, and signed the lease. He authenticated documents related to his rental of the apartment, which were subsequently admitted into evidence. He then testified that prior to signing the lease, he did a walk-through of the apartment, which he described as a studio apartment, but "smaller," consisting of "one room and one restroom."

¶ 8    Counsel for the State asked Outlaw, "Now, after you rented this apartment on December 15, [2016,] did you get keys to that apartment?" Outlaw testified, "Yes." Counsel for the State then asked, "Did you keep those keys?" Outlaw testified, "No." Counsel for the State asked, "Who did you give them to?" Outlaw testified that he gave them to the defendant. Outlaw further testified that he did not move any of his own possessions into the apartment, had no need for the apartment for himself, and never visited the apartment again after giving the keys to the defendant. He did not pay rent for the apartment, as that was supposed to be done by the defendant. Outlaw did not know if the defendant kept up with the rent payments. Outlaw was shown late rent notices that were addressed to Outlaw. He testified that he had never seen the notices before. He was asked if he ever moved guns or ammunition into the apartment. He testified that he did not. On cross-examination, Outlaw agreed that he had no knowledge "of who was actually in and out of" the apartment and did not know if people other than the defendant might have stayed there.

¶ 9    Detective Tyler Pingolt of the Carbondale Police Department was the next witness to testify. Pingolt was asked if, on March 15, 2017, he knew or was "aware of" the defendant. He answered, "Yes." He was then asked if he knew the defendant "by sight." He again answered, "Yes." He then identified the defendant in court. When asked why officers were looking for the defendant on March 15, 2017, Pingolt testified that the defendant "had a warrant for his arrest." Pingolt subsequently testified that he and other officers learned that the defendant might be living in the apartment in question, and spoke with Amelia Smith, the manager of the apartment complex. When the officers learned the name of the person who rented the apartment, they had "a suspicion

4

as to who the actual occupant" was. They showed Smith a picture of the defendant, and based upon her response, officers requested and received Smith's permission to use a nearby vacant apartment to conduct surveillance on the apartment in question. At approximately 7:30 the following morning, Pingolt and Detective Brandon Weisenberger began the surveillance. Pingolt testified that the officers had a clear view of the apartment in question, and that during the approximately 3.5 hours they continuously conducted their surveillance, the defendant was the only person to exit and then reenter the apartment, which he did multiple times.

¶ 10    Pingolt testified that at times the officers recorded their surveillance on "a handheld video camcorder." Pingolt was shown, and authenticated, three DVD videos produced from their surveillance, which over the objection of the defendant were admitted into evidence and played for the jury. As the first video was played for the jury, Pingolt testified that the defendant could be seen exiting the apartment. He was again asked if he knew the defendant "by sight," to which he again answered, "Yes." Pingolt provided additional testimony as the video was played, again testifying that it was the defendant who could be seen in the video. He agreed that the defendant never knocked on the door, or requested entry, but instead "just entered."

¶ 11    Pingolt testified that at approximately 11 that morning, the defendant exited the apartment a final time and entered his vehicle. Pingolt testified that he exited the surveillance apartment to verify it was the defendant who got into the vehicle and drove away. He then radioed other officers who were prepositioned in the area, and they stopped the defendant's vehicle and arrested him. Pingolt testified that based upon information later received from the apartment complex management, officers thereafter requested and received a warrant to search the apartment. The warrant was "executed in the afternoon hours" of that day. During the search, officers discovered a rifle—part of which was sticking out from underneath the bed in the apartment—and a handgun that was found lying on the top of the bed, as well as ammunition and ammunition clips. Pingolt

authenticated various photographs taken of the apartment, and the weapons and related materials, during the execution of the search warrant. He testified that officers also located documents in the apartment, including a traffic citation issued to the defendant, a 2016 W-2 tax statement bearing the defendant's name, a 2015 receipt bearing the defendant's name, and a John A. Logan College identification card bearing the name and photograph of the defendant. All of the foregoing were admitted into evidence. No documents related to Bruce Outlaw were found in the apartment.

¶ 12    On cross-examination, Pingolt agreed that officers were doing surveillance of the apartment "because there was confusion over who lived" there. Pingolt testified that officers did not look for the defendant at the address that was found on the W-2 form, or the different address that was found on the traffic citation. He agreed that he did not know if the defendant had belongings at these addresses or any other addresses. He also agreed that the first time the officers saw the defendant on the morning of the surveillance, the defendant was leaving a different apartment in the complex. Pingolt testified that after the defendant was arrested, and officers left the area, surveillance of the apartment in question ceased. Managers of the apartment complex at some point entered the apartment—without the police and not at the request of the police—and thereafter informed the police of what they had found in the apartment, which led to the request for the search warrant. He agreed with defense counsel that the search warrant was served at 5:05 that afternoon. On redirect examination, Pingolt testified that after the defendant was arrested, officers contacted Outlaw, who was cooperative with them.

¶ 13    Detective Brandon Weisenberger testified next. He too was directed to March 15, 2017, and was asked both if he knew the defendant and if he knew him by sight. Weisenberger responded affirmatively to each question. He then identified the defendant in court. When asked why officers were looking for the defendant on the date in question, Weisenberger testified that the defendant "was the subject of an active arrest warrant." Weisenberger testified consistently with Pingolt as

6

to the officers' surveillance of the apartment. He too was shown parts of the videos the officers recorded, and like Pingolt, Weisenberger testified multiple times as the video played that the defendant was the person shown on the video and present in the apartment. He also testified consistently with Pingolt with regard to the execution of the search warrant—and the weapons, ammunition, clips, and documentation discovered in the apartment—as well as with regard to the cooperative nature of the officers' subsequent dialogue with Outlaw. On cross-examination, Weisenberger agreed that no DNA testing, and no fingerprint testing, was performed on anything found in the apartment. He testified that he continued surveillance on the apartment in question for "at least 15 minutes" after the defendant left the apartment for the last time at approximately 11 a.m., then Weisenberger stopped his surveillance and left.

¶ 14　　The third and final officer to testify at the defendant's trial, Sergeant Anthony Williams of the Carbondale Police Department, was directed to March 16, 2017, and thereafter was asked, "do you know [the defendant]?" He testified, "I do," and then identified the defendant in court. When asked why the defendant was "a person of interest" on March 16, 2017, Williams testified that the defendant "had some warrants at that time." Williams testified that at approximately 11 that morning, Williams followed the defendant as the defendant left the apartment complex. Williams testified that he "was already familiar with" the defendant's vehicle. He testified that he arrested the defendant, and that a subsequent inventory search of the defendant's vehicle revealed "an envelope that was addressed to a 'Bruce' at" the apartment in question and that was from the apartment management company. Also found in the vehicle was a "Landlord's 5-day Notice" from the management company, dated March 13, 2017, and addressed to Bruce Outlaw at the address of the apartment in question. A third document, which Williams testified was a request for rent, was found in the vehicle. It was dated March 15, 2017, was addressed to "Bruce" at the apartment in question, and was from the apartment management company. On cross-examination, Williams

7

testified that he could not recall if he found the "keys" to the apartment in the defendant's possession when he arrested the defendant. On redirect examination, he testified that he believed there were keys in addition to the vehicle's key in the defendant's possession when the defendant was arrested, and that he thought there was a key ring, "but I can't say." He testified that he did not return to the apartment to see if any keys opened the apartment door and did not know if other officers did so.

¶ 15    Amelia Smith testified that she was the manager of the apartment complex in question. She testified that on December 2, 2016, a man—accompanied by a "female friend"—came to the complex to fill out a rental application. She authenticated the previously admitted rental application filled out by Outlaw, as well as the photo identification documents Outlaw provided to her along with the application, and the lease that was subsequently signed by Outlaw. She testified that a new tenant at the complex would be given "two door keys and a mailbox key, some parking passes." She testified that she "very seldom" interacted with the tenant of the apartment in question. She testified that when police showed her a photograph of the defendant, she believed it was Outlaw, whom she believed was living in the apartment, and with whom she interacted with regard to certain rent payments.

¶ 16    Smith testified that when she learned the defendant—whom she reiterated she knew as Bruce Outlaw—had been arrested, no one from the apartment management company went into the apartment in question until "later on" that day. She testified that after police left the area, she "eventually" went into the apartment, because a car kept driving past the apartment, and at one point the driver of the car, a woman, even "spoke to" Smith. Smith testified that when she went to the apartment, maintenance worker Chuck Pendleton accompanied her. She testified the door was locked when she and Pendleton arrived at the apartment. Smith testified that she saw a gun underneath the bed in the apartment. She testified that she and Pendleton relocked the apartment

before leaving, then informed the police of what they had seen. She testified that officers returned later that afternoon with a search warrant and executed it.

¶ 17 On cross-examination, Smith testified that she was "not sure for 100 percent" that the defendant was the person who filled out the rental application. When asked if the defendant was the person who later signed the lease, she testified, "I feel like it is, but I'm not going to say 100 percent since we're dealing with two different people." When pressed, she testified that she was not certain that there were two different people. She testified that she dealt with a lot of tenants, and reiterated that she did not have much contact with the tenant of the apartment in question. She testified that she was not asked by police to go into the apartment after the defendant was arrested but did so because she had had tenants arrested before, and sometimes doors or windows were left unlocked when that happened. She testified that she did not see any guns in the apartment other than the rifle. Following Smith's testimony, the State rested its case. A motion for a directed verdict was denied.

¶ 18 The defendant testified that he lived on Almond Street in Carbondale and had never lived at the apartment complex in question, which previous testimony established was on Lewis Lane. He testified that on March 16, 2017, he was at the apartment complex "tending to" a friend who lived at a different apartment in the complex and was an amputee. The defendant testified that he was in a dating relationship with the niece of his friend and had spent the previous night with her at his friend's apartment. He testified that Bruce Outlaw in fact lived at the apartment in question, although he did not "stay there all the time." The defendant testified that the apartment was "mostly *** used for" playing Outlaw's video game system, which various individuals would show up to do. He testified that he hung out at the apartment two or three days per week but did not spend the night there. He testified that the documents of his that were found when the search warrant was executed had been in his bookbag. When asked why his bookbag was at the apartment, the

9

defendant testified that Outlaw had WiFi at the apartment, and that the defendant was trying to use the WiFi to do homework there on the date he was arrested. He testified that he did not need to knock on the door of the apartment because Outlaw had invited him there. He explained that the reason he left and reentered the apartment several times that morning was that he was working with another tenant, in another unit, to try to figure out the WiFi situation. He testified that other than the bookbag and its contents, he did not have any property in the apartment. He testified that he had never seen the rifle or the handgun before. He reiterated that he did not live at the apartment and did not have a key to the apartment but had free access to come to the apartment and hang out "any time." He testified that the apartment was unlocked the entire time he was seen leaving it and reentering it on March 16, 2017, and that Outlaw was inside the apartment the entire time. He testified that he and Outlaw sometimes shared rides in the vehicle the defendant was driving when the defendant was arrested, and that possibly that is how some of Outlaw's documents ended up in the car. He denied that he ever asked Outlaw to rent an apartment for him. On cross-examination, the defendant denied that he ever paid rent for the apartment. Also on cross-examination, counsel for the State elicited testimony from the defendant that the defendant had two drug-possession convictions: the federal conviction from 1999 and the state conviction from 2017. Following the defendant's testimony, the defense rested.

¶ 19    The next morning, the State presented evidence in rebuttal. Bruce Outlaw Jr. testified that he never stayed at the apartment in question, did not play video games or own a video game system, did not invite people to hang out at the apartment to play video games, and, after the defendant was arrested, did not call the apartment complex management to ask for a key so that he could retrieve personal possessions from the apartment. He testified that he did not have any personal property at the apartment.

10

¶ 20    Detective Weisenberger testified as to where certain items were found in the apartment when the apartment was searched, including to the fact that some of the items belonging to the defendant were not found inside of the defendant's bookbag, and that the handgun was found directly underneath the bookbag, on top of the bed. Weisenberger testified that in an interview at the Carbondale Police Department, the defendant told Weisenberger that the defendant had "no connection" to the apartment in question, but had connections to other apartments in the complex. Weisenberger testified that the defendant never told Weisenberger that the defendant regularly visited the apartment and played video games there. On cross-examination, Weisenberger testified that the search warrant was executed at 5:05 p.m. on the date the defendant was arrested, and that Weisenberger believed Smith and Pendleton entered the apartment at approximately 3:15 p.m.

¶ 21    Counsel for the State began his closing argument by posing the question, "Whose apartment was it?" Counsel posited that once that was decided, "you've decided this case," and went on to address the question of who possessed the guns in question. He posited that "whoever was actually using that apartment possessed those guns. It's as simple as that." He presented his view of what the evidence in the case showed, noting in particular that no identification documents connected to Outlaw were found in the apartment, Outlaw testified that he lived at a different apartment complex in Carbondale, and that it was the defendant who was seen on the videos "just walking in and out of that place like he owned it."

¶ 22    Defense counsel, on the other hand, used her closing argument to stress that she believed the evidence showed that Outlaw, not the defendant, was the occupant of the apartment. She argued that, in her view, it was not credible to believe that Outlaw would have, in essence, allowed the defendant to assume Outlaw's identity, and then would not have followed up with the defendant, visited the apartment, etc. She pointed out that no witnesses testified that they had ever seen the defendant with a gun, and that there was not "one shred of evidence" that the defendant knew the

guns were in the apartment. She added that there was no evidence that the defendant exercised control over the guns or intended to do so. She also pointed out that after the defendant was arrested, the police did not do anything to try to learn if other people in the area may have had access to the apartment, and therefore the guns. Instead, the police simply ended their investigation. She noted that no physical evidence, such as fingerprints, tied the defendant to the guns either.

¶ 23　With regard to the charges of unlawful possession of a weapon by a felon, the jury was instructed, *inter alia*, as follows:

> "Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing, but he has both the power and the intention to exercise control over a thing either directly or through another person. If two or more persons share the immediate and exclusive control or share the intention and the power to exercise control over a thing, then each person has possession."

¶ 24　The jury was also instructed, *inter alia*, that "[a] person commits the offense of unlawful possession of a weapon by a felon" if that person has been convicted of a felony and "knowingly possesses a firearm." The jury retired to begin its deliberations at 11:03 a.m. Thereafter, at a time unspecified in the record, the jury sent a note to the trial judge that asked, "What is the process when we have deliberated and haven't reached a unanimous decision?" The trial judge asked the parties for suggestions, then stated that he believed he should give the jury "the 26.07 *Prim* instruction." See *People v. Prim*, 53 Ill. 2d 62 (1972). The parties agreed. The trial judge instructed the jury accordingly and then told the jury he was "going to release you back to continue your deliberations." After the jury retired to continue its deliberations, the trial judge stated, "For the record, that was given at approximately 4:20 p.m. in response to the question."

12

¶ 25    At 5:04 p.m., the jury returned to the courtroom with its verdict. The jury found the defendant guilty of both counts of unlawful possession of a weapon by a felon. The defendant thereafter filed a motion for a new trial, which was denied. The defendant was sentenced to eight years' imprisonment on each count, to be served concurrently and to be followed by one year of mandatory supervised release. The defendant filed a motion to reconsider sentence, which also was denied. This timely appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, the defendant contends that as either "a matter of plain error or ineffective assistance of trial counsel," he "was denied a fair trial where the State presented evidence of his unrelated criminal conduct that went far beyond the scope of such evidence allowed by the trial court, and where the jury was not given the required instruction limiting their consideration of such evidence." Specifically, he claims the State introduced the following errors at trial: "(1) deliberately elicited testimony from three police officers that they knew [the defendant] before this incident, (2) repeatedly told the jury that [the defendant] had multiple 'warrants' for his arrest after the court limited the State to presenting evidence of a single 'warrant,' and (3) showed the jury a mug shot of [the defendant] taken prior to this incident," which the defendant contends further stigmatized the defendant as a criminal. The defendant also argues that "the jury was never given the required instruction limiting its consideration of any of this other-crimes evidence." He posits that "[t]he only possible purpose behind, or effect of, this extremely prejudicial evidence of other crimes and prior police contact was a prohibited one: to persuade the jury that [the defendant] had a propensity to commit crimes." He contends this is especially true in this case because the defendant never denied that he was the person seen leaving the apartment—indeed, he admitted that he was present in the apartment prior to being arrested—and thus his identity was not at issue; instead, the defendant contends, the sole "question of fact before the jury was whether" the

13

defendant " 'possessed' the items found inside the apartment." With regard to jury instructions, the defendant contends that "[e]ven if this Court finds that no error occurred in the admission of this other-crimes evidence, it should still find the trial court erred by failing to instruct the jury on the limitations on that evidence." He argues that the jury should have been given the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000). He acknowledges that his trial counsel did not object to the evidence in question, or request the jury instruction in question, but asks this court to consider his contentions under the plain error doctrine. In the alternative, he contends that trial counsel's failures demonstrate ineffective assistance of counsel.

¶ 28     The State responds that the "challenged conduct and the lack of [a limiting] jury instruction *** were either permissible, or, in the alternative, did not prejudice the defendant due to the overwhelming nature of the evidence," and that "[t]he weight of the evidence likewise defeats the ineffective assistance of counsel claims regarding the same issues." The State notes the defendant's argument that evidence of police officers' prior familiarity with a defendant can be prejudicial and thus may constitute error, but points out that courts in Illinois have held that such is not the case if there is a good reason for introducing the evidence. The State contends that in this case, the evidence from the three officers that they knew or were familiar with the defendant was "necessary" to show "that the police officers were not confused about the identity of the defendant despite the obvious contradiction in the defendant living in and paying for an apartment as Bruce Outlaw." The State further claims that it "was making a cumulative case as to the identity of the individual who exercised control over the apartment." The State acknowledges that the reason mug shot photographs are often excluded at trial is because they imply that the defendant has been arrested previously, but contends that the mug shot of the defendant in this case was properly admitted to show "that the defendant was exercising control of the firearms by being the sole

14

resident of the apartment listed under the name of Bruce Outlaw," and that because the State "was required to prove the defendant's control over the apartment, *** it was necessary to inform the jury of the defendant's identity and the misleading nature about the identity of the defendant." With regard to the reference to the arrest warrant, the State posits that counsel "simply made a misstatement when referencing 'warrants' in the plural," and that the defendant suffered no prejudice therefrom. The State points out that two officers correctly testified that the defendant had only "a warrant"—rather than multiple warrants—at the time of his arrest. The State further argues that because there were no errors in the admission of this evidence, there was no need for the limiting instruction, and that in any event, the defendant was not prejudiced by the absence of the limiting instruction, due to the weight of the evidence against the defendant.

¶ 29 In his reply brief, the defendant reiterates that the sole "question before the jury was whether [the defendant] constructively possessed the guns found in [the] apartment," not whether the apartment was rented in the name of another person, and not whether the defendant was the person seen leaving the apartment and arrested thereafter. He rejects the State's assertion that the evidence in this case was overwhelming, instead contending that it was closely balanced. He points out that the jury was left to make credibility determinations with regard to who had control over the apartment prior to the discovery of the weapons therein, and deliberated for approximately five hours prior to sending out a note advising the trial judge and the parties that the jury was deadlocked. He adds that another 45 minutes of deliberations were required, after receiving the *Prim* instruction, before the jury reached its verdict. The defendant also notes that even if allowing two witnesses to testify with regard to the mug shot was permissible, the court should not have allowed the jury to have the mug shot with it during deliberations. He reiterates his argument as to how damaging the lack of the limiting jury instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) was, in light of all of the propensity and other-

15

crimes evidence that the jury heard, and reiterates his arguments regarding plain error and ineffective assistance of counsel.

¶ 30     We begin our analysis by examining the State's decision to adduce testimony from all three police officers who testified for the State that the three officers knew, or were aware of, the defendant at the time of his arrest, as well as evidence that two of those officers knew the defendant by sight (with one officer, Detective Pingolt, stating on two different occasions during his testimony that he knew the defendant by sight). We do not find convincing the reasons given by the State for why it was "necessary" to adduce this evidence. As explained above, the State's contention on appeal is that the testimony was necessary to show "that the police officers were not confused about the identity of the defendant despite the obvious contradiction in the defendant living in and paying for an apartment as Bruce Outlaw." The State further claims that it "was making a cumulative case as to the identity of the individual who exercised control over the apartment."

¶ 31     Although it is true that Amelia Smith was confused at trial as to whether the defendant was in fact the person who signed the rental application and lease, Smith's confusion as to that point had no relevance to the issue of whether the police correctly apprehended a person who was in the apartment several hours prior to the discovery of the weapons therein. Although this case began as an identity theft investigation, it was not charged and tried as one. We agree with the defendant that for purposes of proving the offenses actually charged and tried in this case—two counts of unlawful possession of a weapon by a felon, rather than any offense related to identity theft, giving false information, concealing one's identity, or assuming the identity of another—there was no reason for any officer, let alone three officers, to testify that they knew the defendant previously, and for two officers to testify that they knew the defendant by sight. Indeed, even to the extent the State believed it was necessary to provide the jury with some context—by referencing the

16

subsequently-abandoned identity theft investigation—for the surveillance and apprehension of the defendant, the State easily could have done that without eliciting from the officers their prior familiarity with the defendant.

¶ 32    With regard to the charges being tried, we conclude that the in-court identification of the defendant by multiple witnesses as an individual who was present at the apartment in question on March 16, 2017, as well as the DVD evidence that showed the defendant leaving and reentering the apartment multiple times that morning, was sufficient to establish that the defendant was present in the apartment on the day the weapons were found there, particularly in light of the fact that the defendant admitted that he was in the apartment that day, immediately prior to his arrest. There was simply no relevance—and a whole lot of potential prejudice—to the fact that all three officers knew of the defendant, and that two knew him by sight.[2] Likewise, because there was no evidence that Bruce Outlaw—or for that matter, anyone else bearing any type of resemblance to the defendant—was in the common area of the apartment complex at the time the police observed someone leaving the apartment, there was no plausible reason—and certainly no necessity—for the officers to rely on their prior familiarity with the defendant for them to ensure they had arrested the person who actually left the apartment, rather than someone who simply looked like that person and happened to be in the area. In short, the defendant is correct that his identity was not at issue in light of the facts of this case, and for purposes of the offenses for which the defendant was actually charged and tried.

---

[2]Although the defendant does not stress this fact in his briefs on appeal, it likewise was not necessary for Sergeant Williams to testify that he "was already familiar with" the defendant's vehicle, prior to stopping it and arresting the defendant. The same is true with regard to counsel for the State's remark, in his opening statement, that when officers received a "general physical description" from the apartment manager of the man the manager knew to be the resident of the apartment question, the officers "had an idea that maybe it was actually the defendant."

¶ 33　We conclude as well that there was no legitimate reason for counsel for the State, or for any witness, to refer to the defendant having "warrants" for his arrest, in light of the trial judge's ruling that the State could refer only to a warrant, and in light of the fact that there is no evidence of record that there were multiple warrants outstanding at the time of the investigation and subsequent apprehension of the defendant. Even if the reference to "warrants," rather than a single "warrant," was unintentional on the part of counsel for the State, and on the part of Sergeant Williams, it nevertheless had the potential to harm the defendant, as it unfairly and inaccurately suggested the possibility that he was a habitual criminal on the run, or perhaps had been on some sort of multi-jurisdictional crime spree, racking up multiple warrants, shortly before his arrest in the present case. We also agree with the defendant that having all three officers testify as to the existence of a warrant or warrants was unduly repetitive and therefore potentially prejudicial to the defendant for that reason as well. Likewise, there was no legitimate reason for the admission into evidence of the mug shot photograph of the defendant, which both Pingolt and Smith authenticated as the photograph that Pingolt showed Smith, which in turn led to the initial surveillance of the apartment by Pingolt and Weisenberger. There was no dispute at trial as to the legality of the surveillance, and, as discussed in detail above, there was no dispute as to the identity of the defendant as the person seen exiting the apartment at approximately 11 a.m. on the day that the weapons were discovered in the apartment at approximately 3:15 p.m. Accordingly, the photograph added nothing legitimate to the State's effort to convict the defendant of the crimes with which the State chose to charge and try the defendant. Being a mug shot, the photograph only added to the potential prejudice suffered by the defendant.

¶ 34　For these reasons, we simply cannot agree with the State's arguments on appeal that the foregoing evidence was "necessary" and therefore was properly admitted. Moreover, we agree with the defendant that even if we were to assume, *arguendo*, that all of the aforementioned

18

propensity and other-crimes evidence somehow was admitted properly for a legitimate limited purpose, or purposes, not argued by the State on appeal, that would not diminish the need for the jury to be instructed about the limits to which that evidence could be considered by the jury. Indeed, as the defendant correctly notes, logic dictates that the more propensity and other-crimes evidence a jury hears, the more important the limiting instruction becomes. As this court has long noted, propensity and other-crimes evidence, even when admissible because it is "relevant for some limited purpose in the case being tried, carries a risk of unfair prejudice to the defendant." *People v. Harris*, 288 Ill. App. 3d 597, 605 (1997). One "danger is that the jury will use the evidence for an improper purpose, such as to conclude that the defendant has a propensity to commit crime." *Id*. We therefore have held that "[t]he best way to address the problem is to use the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 [(4th ed. 2000)], taking care that the proper limited purpose of the evidence is used." *Id*. at 606. The limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 instructs a jury that evidence has been admitted of offenses or conduct other than that charged for trial, specifies the purpose for which that evidence was admitted (such as, *e.g.*, identification, presence, intent, motive, design, or knowledge), and informs the jury that the evidence may be considered only for the limited purpose for which it was admitted. Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000).

¶ 35     This court has held that, as a general proposition, "[t]he failure of an attorney to seek a limiting instruction when [the defendant] is entitled to one is not a matter of discretion or trial strategy" and therefore may demonstrate that an attorney's performance was deficient. *People v. Hooker*, 253 Ill. App. 3d 1075, 1085 (1993). Thus, despite our disagreement with the State's arguments on appeal, even if we indulge those arguments and assume, *arguendo*, that the evidence in this case was admissible, we still must consider the defendant's contention that with regard to

this matter he received ineffective assistance of counsel. Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, the defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). To demonstrate prejudice under *Strickland*, a defendant need only show that it is reasonably probable that a more favorable result would have been obtained absent counsel's unprofessional errors. *People v. Fletcher*, 335 Ill. App. 3d 447, 455 (2002). This court has held that a reasonable probability is one sufficient to undermine our confidence in the outcome of the case, and that there is no requirement that a defendant prove by a preponderance of the evidence that a more favorable result would have been obtained. See, *e.g.*, *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45. To the contrary, we may find that the prejudice prong of our analysis is satisfied even if the chance of an acquittal is significantly less than 50%, as long as we conclude that a verdict of not guilty would be a reasonable one. *Id.*

¶ 36    In this case, we can think of no strategic reason for the defendant's trial counsel to fail to seek a limiting instruction with regard to the assortment of propensity and other-crimes evidence the jury heard in this case. The State has not suggested any possible strategic reasons for the failure either. Thus we conclude the defendant has demonstrated that his trial counsel's performance was deficient with regard to this issue. See, *e.g.*, *Hooker*, 253 Ill. App. 3d at 1085 (as a general

20

proposition, "[t]he failure of an attorney to seek a limiting instruction when [the defendant] is entitled to one is not a matter of discretion or trial strategy" and therefore may demonstrate that an attorney's performance was deficient).

¶ 37 We turn therefore to the prejudice prong of our *Strickland* analysis, which asks if it is reasonably probable that a more favorable result would have been obtained absent counsel's unprofessional error. The State contends that in this case the evidence of the defendant's guilt was overwhelming, stating that "[t]here is simply nothing that the defendant testified to that could attempt to match the evidence presented by the State." We do not agree. We note that the defendant's testimony is not the only evidence that is relevant to this question. The State's own evidence—and the gaps therein—is also probative of whether it is reasonably probable that a more favorable result would have been obtained in the absence of the jury hearing, with no limiting instruction, all of the propensity and other-crimes evidence that was presented in this case.

¶ 38 With regard to this point, the defendant notes that the jury in this case deliberated for approximately 5 hours prior to sending out a note advising the trial judge and the parties that the jury was deadlocked, and another 45 minutes of deliberations were required, after receiving the *Prim* instruction, before the jury reached its verdict. As the defendant concedes, lengthy jury deliberations are not determinative with regard to whether evidence of guilt is overwhelming or close, but the length of deliberations, along with notes and questions sent by deliberating jurors, are legitimate factors for courts of review to consider. See, *e.g.*, *People v. Walker*, 211 Ill. 2d 317, 342 (2004).

¶ 39 With the foregoing in mind, we turn to the potential problems that the gaps in the State's evidence might have presented to jurors in this case. As discussed in detail above, Amelia Smith testified that new tenants were given, *inter alia*, "two door keys" upon renting an apartment at the complex. Counsel for the State asked Bruce Outlaw Jr., "Now, after you rented this apartment on

21

December 15, [2016,] did you get keys to that apartment?" Outlaw testified, "Yes." Counsel for the State then asked, "Did you keep those keys?" Outlaw testified, "No." Counsel for the State asked, "Who did you give them to?" Outlaw testified that he gave them to the defendant. However, Sergeant Williams testified on cross-examination that he could not recall if he found the "keys" to the apartment in the defendant's possession when he arrested the defendant. On redirect examination, he testified that he believed there were keys in addition to the vehicle's key in the defendant's possession when the defendant was arrested, and that he thought there was a key ring, "but I can't say." He testified that he did not return to the apartment to see if any keys opened the apartment door and did not know if other officers did so. No other evidence about the keys—or about whether a key was required to lock the door to the apartment when exiting it—was adduced by the State. The defendant denied that he lived at the apartment and denied that he ever had a key to the apartment.

¶ 40    Detective Pingolt testified on cross-examination that after the defendant was arrested, and officers left the area, surveillance of the apartment in question ceased. Detective Weisenberger testified that he continued surveillance on the apartment in question for "at least 15 minutes" after the defendant left the apartment for the last time at approximately 11 a.m., then stopped his surveillance and left. Smith testified that when she learned the defendant had been arrested, no one from the apartment management company went into the apartment in question until "later on" that day. She testified that after police left the area, she "eventually" went into the apartment, because a car kept driving past the apartment, and at one point the driver of the car, a woman, even "spoke to" Smith. She testified that when she went to the apartment, maintenance worker Chuck Pendleton accompanied her. She testified the door was locked when she and Pendleton arrived at the apartment. Called to testify for the State in rebuttal, Weisenberger testified on cross-examination that he believed Smith and Pendleton entered the apartment at approximately 3:15 p.m.

22

¶ 41    Thus, for the total of approximately six hours that they deliberated, the jurors were left to ponder a situation in which, according to the evidence presented to them at trial, (1) the apartment apparently remained unwatched for possibly up to four hours after the defendant's arrest—from the time Weisenberger vacated it "at least 15 minutes" after the defendant left for the last time at approximately 11 a.m., until the time Smith and Pendleton entered the apartment at approximately 3:15 p.m.—and that during that time at least one car drove past the apartment several times; (2) the State failed to account, at the time of the defendant's arrest or at any time thereafter, for either of the two keys issued to Outlaw when he rented the apartment; (3) the defendant testified that Outlaw was present at the apartment the entire time the defendant was entering and exiting it; (4) on cross-examination, Outlaw testified that, despite the fact that the apartment was rented in his name, he had no knowledge "of who was actually in and out of" the apartment and did not know if people other than the defendant might have stayed there; and (5) Smith testified on cross-examination that one of the reasons she entered the apartment after the defendant was arrested was because she had had tenants arrested before, and sometimes doors or windows were left unlocked when that happened.

¶ 42    As explained above, during his closing argument, counsel for the State posited that "whoever was actually using that apartment possessed those guns. It's as simple as that." During her closing argument, the defendant's trial counsel, *inter alia*, encouraged the jury to find it not credible to believe that Outlaw would have, in essence, allowed the defendant to assume Outlaw's identity and then would not have followed up with the defendant, visited the apartment, etc. Jurors who were sympathetic to this argument, and skeptical of Outlaw's testimony—and thus the State's theory—that after renting the apartment in his own name, Outlaw never returned to the apartment to check up on it, and never even contacted the defendant to ensure that the rent was being paid, despite Outlaw's testimony that he considered the defendant an associate rather than a friend,

certainly might have been troubled by the gaps in the evidence presented by the State. Reasonable jurors in such a situation could have believed that Outlaw, or some third party with access to one of the unaccounted-for keys—possibly the woman in the car that drove past the apartment several times—entered the apartment during the up to four hours that the apartment apparently was unwatched after the defendant's arrest, and placed the guns there. Because there were at least two keys to the apartment door, and because no testimony was adduced as to whether a key was even necessary to lock the door when leaving the apartment, jurors could have believed this was true even if they believed the defendant locked the door when he left the apartment just prior to his arrest, or even if they believed that, despite the absence of evidence verifying it, the defendant possessed a key to the apartment at the time of his arrest.

¶ 43   Jurors would not have had to believe that if the guns were placed in the apartment after the defendant's arrest, they were placed there for nefarious purposes, because although jurors could have believed that the guns were placed in the apartment by Outlaw, or someone else with a key, to "set up" the already-arrested defendant once the apartment was eventually inventoried, they also could have believed that whoever placed the guns there did so with no knowledge of the defendant's arrest and for totally unrelated reasons, or with knowledge of the defendant's arrest on the federal warrant but with the belief that neither the defendant nor the police would be returning that day, and that therefore the apartment was a safe space to—perhaps temporarily— store the guns.[3] Although more far-fetched, it is even possible, given the gaps in the State's case, that jurors could have believed that Smith and Pendleton placed the guns in the apartment, having decided that a tenant who required overdue rent notices and who attracted police surveillance of

_____

[3]It is not clear from the record—and the jury was certainly never informed—who, if anyone, alerted police in the first place to the possibility that the defendant might be found at the apartment in question, and thus who, if anyone, might have wanted to "set up" the defendant or see that he no longer could return to the apartment.

24

the complex was no longer a desirable tenant to have. Under any of these scenarios, jurors who believed the guns were not present in the apartment at the time the defendant last left it, at approximately 11 a.m., would have been hard-pressed to believe that the State had proved, beyond a reasonable doubt, that the defendant knowingly constructively possessed the guns. This is particularly true because constructive possession required not only knowledge that the guns were there, but also required the power to exercise control over the guns, which the defendant clearly lacked once he was arrested and held in custody.

¶ 44     In their arguments on appeal, the parties agree on one thing: the jury in this case heard the testimony of Outlaw and the other witnesses for the State, and also heard the testimony of the defendant, all of which is described in detail above. Based upon the totality of the evidence presented in this case, we agree with the defendant that, ultimately, the question of whether the defendant could be found guilty beyond a reasonable doubt of knowingly possessing—via the State's theory of constructive possession—the handgun and the rifle in question in this case comes down to a credibility contest as to who had access to the apartment on March 16, 2017, and we stress that includes not only during the time the defendant was undeniably present at the apartment, but also the time during which the apartment was apparently unwatched (and possibly even, at times, unlocked) after the defendant left it and was arrested. We also agree with the defendant's assessment that this case is akin to *People v. Moore*, 2020 IL 124538, ¶ 52, wherein the Illinois Supreme Court found that the case before it presented "a classic case of closely balanced evidence," because "[t]he jury was faced with two plausible versions of events that depended on witness credibility." As the defendant aptly notes, in such cases, trial counsel's failure to prevent the jury from hearing overly prejudicial other-crimes evidence constitutes ineffective assistance of counsel. See *id*.

¶ 45     The State contends the defendant's testimony was not plausible, in part because of Weisenberger's testimony, in rebuttal, that the defendant admitted to having connections to other apartments in the complex but denied having any connection at all to the apartment in question. However, we note that jurors could have believed that the defendant might have made such a denial even if there were no guns present in the apartment at the time of the defendant's arrest, or even if the guns were present but the defendant did not know of their presence. First, jurors could have believed that the defendant might have concluded that simply hanging out at an apartment several times a week (which the defendant testified was the totality of his involvement with the apartment) was not a sufficient "connection" to the apartment to characterize it as one when questioned by Weisenberger. Second, jurors could have believed that the defendant might have feared that if he admitted a connection to the apartment, police would attempt to charge Outlaw or other congregants at the apartment with aiding, abetting, or sheltering the defendant at a time when a warrant (or warrants, as the jury heard inaccurately from counsel for the State, and from Sergeant Williams) existed for the defendant's arrest. Third, because of the stipulation the trial judge read to the jury, and because on cross-examination the defendant admitted that he had two drug-possession convictions, jurors knew that the defendant had prior felony convictions, and could have believed that as a result of those convictions, the defendant harbored a general mistrust of the police that led him to be less than forthcoming with Weisenberger. Jurors also could have believed the defendant's explanations for how documents with his name on them ended up in the apartment, and how documents with Outlaw's name on them ended up in the vehicle the defendant was driving when he left the apartment and was arrested. Put simply, there was nothing inherently implausible or incredible about the defendant's testimony, and we cannot agree with the State that the evidence against the defendant in this case was overwhelming.

¶ 46    As explained above, this court has held that, for purposes of a prejudice-prong *Strickland* analysis, a defendant need only show that it is reasonably probable that a more favorable result would have been obtained absent counsel's unprofessional errors. *People v. Fletcher*, 335 Ill. App. 3d 447, 455 (2002). We have further held that a reasonable probability is one sufficient to undermine our confidence in the outcome of the case, and that there is no requirement that a defendant prove by a preponderance of the evidence that a more favorable result would have been obtained. See, *e.g.*, *Lucious*, 2016 IL App (1st) 141127, ¶ 45. To the contrary, we may find that the prejudice prong of our analysis is satisfied even if the chance of an acquittal is significantly less than 50%, as long as we conclude that a verdict of not guilty would be a reasonable one. *Id.* For the foregoing reasons, we conclude that a verdict of not guilty on the two counts in this case, although certainly not inevitable, nevertheless would have been a reasonable one, and that therefore a reasonable probability exists that the jury would have acquitted the defendant of the two counts were it not for the assortment of propensity and other-crimes evidence that the jury, without a limiting instruction, heard in this case. As a result, we conclude that the defendant's trial counsel's failure to request such an instruction deprived the defendant of effective assistance of counsel.

¶ 47    We note that the defendant does not challenge the sufficiency of the evidence used to convict him. In fact, he requests a new trial, not acquittal. Moreover, although we have found that there is a reasonable probability that the jury would have acquitted the defendant were it not for the assortment of propensity and other-crimes evidence that the jury, without a limiting instruction, heard in this case, we nevertheless also find that based upon the totality of the evidence properly presented, a reasonable jury could have found the defendant guilty beyond a reasonable doubt of the two counts with which he was charged. Therefore, retrial of the defendant is not barred by principles of double jeopardy. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18.

¶ 48                                        III. CONCLUSION

¶ 49    For the foregoing reasons, we reverse the defendant's convictions and sentences and remand for a new trial.


¶ 50    Reversed and remanded.


¶ 51    JUSTICE CATES, specially concurring:

¶ 52    I concur in the majority's order. The State's unfettered presentation of much of the propensity and other crimes evidence was improper, and the admission of that evidence without objection, or a request for a limiting instruction by the defendant's counsel constituted prejudicial error, and ineffective assistance of counsel, requiring a new trial. I write separately to address the prejudicial prong of the analysis, and to consider a related evidentiary issue that may arise on remand.

¶ 53    In this case, the defendant candidly acknowledged that some of the other crimes evidence was admissible for specific and limited purposes. The defendant was charged with two counts of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2016)), and thus evidence of a prior felony conviction was a necessary element of that offense. The narrowly crafted stipulation indicated that the defendant had a prior felony conviction without identifying the offense or any details regarding the defendant's prior conduct, and the trial court instructed the jury on the purposes for which they could consider that evidence. The trial court also acted within its discretion in permitting the State to impeach the defendant with two prior drugs convictions, if the defendant decided to testify. See *People v. Atkinson*, 186 Ill. 2d 450, 462-63 (1999); *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971). Finally, the trial court permitted the State to present

evidence that the defendant had an outstanding warrant for his arrest to explain why the police were looking for the defendant.

¶ 54    As detailed in the majority's decision, the State did not limit its use of other crimes evidence to those purposes specified. During opening statements, the prosecutor told jurors that police officers were looking for the defendant because he had outstanding warrants, using the plural, not the singular form of that word. During the trial, when asked why officers were looking for the defendant, two of three police officers testified, without objection, that the police were looking for the defendant because he had a warrant for his arrest, while a third police officer testified that the defendant had "some warrants." Additionally, upon questioning by the prosecutor, each police officer testified, without objection, that he "knew or was aware of" the defendant, and two officers testified, without objection, that they knew the defendant "by sight." The State also presented evidence of the defendant's mug shot, and this photograph was shown to the jury. Like my colleagues, I find that on balance, the repeated references to the defendant's outstanding warrant or warrants, the "officer familiarity" testimony, and the "mug shot" evidence was unfairly prejudicial. Here, the defendant's trial testimony was a substantial part of his defense, and his credibility was a central issue. The State's contention on appeal, *i.e.*, that the officers' testimony as to their familiarity with the defendant was relevant to establish the defendant's identity, is not well taken. As noted in the majority's decision, there was no dispute as to the identity of the defendant as the person entering and leaving the subject apartment on March 16, 2017. And, because there was no objection to the testimony at trial, the prosecutor was not challenged to explain its relevance. The same is true of the "mug shot" evidence.

¶ 55    The principles governing admissibility of other crimes evidence are well established. While evidence of other crimes is admissible if relevant to establish any fact material to the prosecution, it is not admissible merely to establish a defendant's disposition or propensity to commit crime.

*People v. Donoho*, 204 Ill. 2d 159, 170 (2003); *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991). Courts generally prohibit the admission of other crimes evidence because of the danger that the jury might convict a defendant because he or she is a bad person who deserves punishment. *Donoho*, 204 Ill. 2d at 170 (other crimes evidence is not considered irrelevant; it is objectionable because it has "too much probative value"). In considering what constitutes other crimes evidence, direct proof of a criminal act is not necessary; it is sufficient that the evidence could lead the jury to infer prior criminality on defendant's part. *People v. Nichols*, 235 Ill. App. 3d 499 (1992). Thus, testimony that a police officer was previously acquainted with a defendant, even if not introduced as evidence of a criminal history, may imply such a history, and for that reason, such testimony is better avoided, unless relevant to a material issue in the case. See *People v. Bryant*, 113 Ill. 2d 497, 514 (1986). Similarly, when identification is not a material issue in the case, "mug shot" evidence tending to inform a jury of the defendant's commission of other, unrelated criminal acts should not be admitted. See *People v. Nelson*, 193 Ill. 2d 216, 224-25 (2000).

¶ 56    During the trial, the State offered "officer familiarity testimony," other crimes evidence, and a mug shot of the defendant, without defense counsel's objection or request for a limiting instruction. I agree with my colleagues' finding that there seems to be no strategic reason for defense counsel's failure to seek a limiting instruction, and as such, defense counsel's performance was deemed deficient.

¶ 57    The next question is whether the improper admission of the other crimes evidence was unfairly prejudicial. In this appeal, the State argues that the defendant was not prejudiced by the erroneous admission of the other crimes evidence, suggesting that the evidence of the defendant's guilt was overwhelming, and that the defendant's testimony was not plausible. A defendant is entitled to have his guilt or innocence evaluated based solely on the charged offense. *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983). It is the duty of the prosecution to safeguard the rights of all

the people, and that duty extends to a criminal defendant. *Id.* It is the jury's function to assess the credibility of the witnesses, assign weight to the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Ward*, 2011 IL 108690, ¶ 34. As noted above, this case involved conflicting testimony regarding the constructive possession of the weapons found in the subject apartment. Thus, the outcome of the case depended on the jury's assessment of the credibility of the witnesses, including the defendant. The defendant's testimony was a substantial part of the defense, and the improper admission of other crimes evidence may have led the jury to find the defendant guilty. What is clear from the record is that the evidence was closely balanced, the jury deliberations were lengthy, and a unanimous verdict was not reached until the jury was given a *Prim* instruction and conducted some additional deliberation. Therefore, I agree that this case presented "a classic case of closely balanced evidence," where the jury was presented with a credibility contest and two plausible versions of events, and that there was a reasonable probability that the admission of other crimes evidence tipped the scales against the defendant. *People v. Moore*, 2020 IL 124538, ¶ 52.

¶ 58    Finally, there is one related evidentiary matter, although not emphasized in the defendant's brief, that may arise on retrial. During the trial, the police officers were permitted to identify the defendant in the surveillance video. In a case decided not long ago, *People v. Thompson*, 2016 IL 118667, ¶ 55, the Illinois Supreme Court considered whether and under what circumstances law enforcement officers may offer identification testimony. Initially, the supreme court discussed the admissibility of lay opinion identification testimony under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011), holding that such testimony is admissible "if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *Id.* ¶ 50. The supreme court noted that lay opinion identification testimony is helpful where there is some basis for concluding the witness is more

likely to correctly identify the defendant from a surveillance recording than the jury. *Id*. The court cautioned, however, that lay identification testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* ¶ 54. Turning to the issue of law enforcement identification testimony, the supreme court held that "when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury." *Id.* ¶ 59. The supreme court further stated that the circuit court should "properly instruct the jury, before the testimony and in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer if that fact is disclosed." *Id*. Should questions arise on remand regarding the admissibility of lay opinion identification testimony from police officers, the rules and precautionary procedures in *Thompson* may guide the circuit court's analysis.

¶ 59     In sum, the defendant has shown that he was deprived of effective assistance of counsel in that trial counsel failed to request a limiting instruction as to the other crimes evidence, and that but for counsel's unprofessional error, there is a reasonable probability that the outcome of the trial would have been different. Nevertheless, there was sufficient evidence from which the jury could have found the defendant guilty beyond a reasonable doubt, and therefore, double jeopardy does not bar a retrial. Accordingly, I concur in the decision to vacate the defendant's conviction and remand the case to the circuit court for a new trial. On retrial, the other crimes evidence should be limited to that which is relevant to material issues in the case, with proper instructions that limit the jury's use of that evidence. And, if the State intends to have law enforcement officers identify the defendant in surveillance video, the defendant should be afforded the procedural safeguards set forth in *Thompson*.